**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| TERRYN RISK,<br><br>　　　　　　　　　　　Plaintiff,<br><br>　　　　vs.<br><br>BURGETTSTOWN BOROUGH,<br>PENNSYLVANIA,<br><br>　　　　　　　　　　　Defendant. | CIVIL DIVISION<br><br>No:  05-CV-01068<br><br>Magistrate Judge Lisa P. Lenihan<br><br>**ELECTRONICALLY FILED**<br><br>**JURY TRIAL DEMANDED** |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION PURSUANT TO F.R.C.P. 50(b)
AND F.R.C.P. 59 FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL**

## I.　　INTRODUCTION

Defendant respectfully submits this brief in support of its timely motion pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure for the entry of judgment as a matter of law in its favor or, in the alternative, for a new trial.

## II.　　STATEMENT OF THE CASE

### A.　　NATURE OF THE CASE AND PROCEDURAL HISTORY

Terryn Risk ("plaintiff"), a former and later retroactively decertified part-time police officer of Burgettstown Borough ("defendant"), filed this civil action against defendant and defendant's Chief of Police George Roberts.  Plaintiff's complaint pleaded seven Counts.  Counts I through IV asserted First Amendment claims against defendant and Chief Roberts that focused on plaintiff's wearing a cross pin on his police uniform, Chief Robert's directing plaintiff to remove the pin, plaintiff's protests of those orders, and plaintiff's belief that he was fired because he wore the pin.  Counts V and VI asserted a violation of Title VII for religious discrimination and retaliation for opposing religious discrimination, and Count VII asserted a violation of the

1

PHRA. *Risk v. Burgettstown Borough*, 2007 U.S. Dist. LEXIS 70048 (W.D. Pa.) (9/21/07) ("*Risk I*"), p. 4, n. 5. Plaintiff did not allege a violation of the Police Tenure Act.

On September 21, 2007, this Honorable Court dismissed Counts I through IV of plaintiff's Complaint. *Risk I*, *supra*, p. 8-11. Having noted that plaintiff wore a cross pin on the lapel of his police uniform "as a sign of his strong Christian beliefs" (*Id.*, p. 2); that Chief Roberts "ordered Risk to stop wearing a cross on his police uniform[, and] Risk protested to both the Borough Council President and Dan Johnson, the Council Police Department liaison, but Roberts insisted" (*Id.*, p. 2); and that "on December 7, 2004, [Risk's] counsel corresponded with Chief Roberts, [with copies to each member of Borough Council,] requesting that Risk be permitted to wear his cross" (*Id.*, p. 3 text and n. 3), the Court held that "**[p]laintiff Risk can premise no claim of Constitutional violation on a restriction of his right to wear a symbol of his Christian beliefs on the lapel of his police uniform while performing his duties in the community** with the significant governmental authority invested by his office. To the contrary, this restriction on his speech is precisely the type of restraint that may be constitutionally imposed by a governmental employer on its employees. See *City of San Diego v. Roe*, 543 U.S. 77, 80, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004) (holding that police officer did not speak on matter of public concern when he used his police uniform/identification to promote a personal agenda)". (*Risk I*, *supra*, p. 8; footnote omitted; emphasis added.)

Continuing, the Court explained, "Moreover, as Defendants have well-briefed, and as the Fifth Circuit had previously concluded, 'a police officer's uniform is not a forum for . . . expressing one's personal beliefs'. *Daniels v. City of Arlington*, 246 F.3d 500, 502-03 (5th Cir. 2001) (concluding that wearing of cross by officer was not speech on a matter of public concern within the protections of First Amendment jurisprudence). Melding personal religious beliefs

2

"with the authority symbolized by the police uniform' risks the appearance of official, governmental endorsement of that religious message. Id. at 504.  Thus, the individual's right - if any - is far outweighed by the necessity of maintaining police uniforms 'as a symbol of neutral government authority, free from expressions of personal bent or bias.'  *Id.* (concluding that even if wearing of cross was constitutionally-protected speech on a matter of public concern, employee's interest was outweighed by municipality's).  (*Risk I*, *supra*, p. 8-9; footnote omitted.)

As to plaintiff's Counts V and VI (violation of Title VII for religious discrimination and retaliation for opposing religious discrimination) and VII (violation of the PHRA), the Court ruled that "**[p]laintiff may, however, continue to premise causes of action on religious discrimination and/or retaliation under Title VII and the PHRA**….Defendants' assertions that Risk premised his religious animus/discrimination claims solely on his right to wear a cross notwithstanding, he has sufficiently asserted those claims, and those of retaliation, **on the basis of his (a) disfavorable treatment on and/or removal from the schedule, and/or (b) selection for termination**."  (*Risk I*, *supra*, p. 11-12; footnote omitted; emphasis added.)

On March 18, 2008, the Court held a motions in limine hearing.  (N.T. 3/18/08.)  During that hearing, the Court made rulings that affected the ensuing trial of the case.

The Court denied defendant's motion *in limine*, which challenged plaintiff's qualification to pursue his lawsuit in light of his retroactive and controlling decertification as a police officer, and which sought to prevent plaintiff from questioning, challenging, undermining, or explaining away his decertification (or for the Court to abstain pending the resolution of plaintiff's pending appeal of the decertification order), and to use the findings of fact and conclusions of law adopted into the decertification order.  (N.T. 3/18/08, P.3.)  The Court effectively ruled that plaintiff was qualified, and it limited defendant's use of the decertification only to challenge

3

plaintiff if he asserted that he was certified, but also without introducing into evidence or showing the jury any documents related to the decertification.  (N.T. 3/18/08, p.12.)

Despite its ruling on the cross pin in *Risk I*, the Court denied defendant's motion that sought to keep the cross pin issue out of the case.  (N.T. 3/18/08, p.51.)  Instead, the Court allowed plaintiff to question the wisdom and validity of Chief Roberts' decision and orders regarding the cross pin.  (Id.; N.T. 3/26/08, p.64.)  In addition, the Court decided to formulate an instruction that would tell the jury that, although plaintiff had no right to wear the cross pin on his uniform and Chief Roberts could order him to remove it, the jury could still find religious discrimination in the orders that the cross pin be removed.  (N.T. 3/18/08, p. 53.)

The Court also denied defendant's motion to preclude documents and testimony about the conversation between Amy Prevost and Chief Roberts.  (N.T. 3/18/08, p.53**.**)

In the week following the motions *in limine* hearing, the case was tried before a jury from March 24 through March 27, 2008.  The jury rendered its verdict via responses to special interrogatories and found that plaintiff's religion was a determinative factor in defendant's decision to terminate him; that plaintiff's complaints of religious discrimination were a determinative factor in defendant's decision to terminate him; and that plaintiff was entitled to $100,000 in compensatory damages.  (N.T. 3/27/08, p. 97.)

Following the jury phase of the trial, the Court turned to plaintiff's non-jury requests for back pay, prejudgment interest, reinstatement, and other equitable relief.  On April 28, 2008, the Court issued its ruling on those requests.  *Risk v. Burgettstown Borough*, 2008 U.S. Dist. LEXIS 34869 (W.D. Pa.) (4/28/08) (*Risk II*).  The Court granted back pay to plaintiff over defendant's objection that he was not entitled to it because of his retroactive decertification.  The Court found "the reasoning of *McKennon v. Nashville Banner Pub. Co.,* 513 U.S. 352, 115 S. Ct. 879, 130 L.

Ed. 2d 852 (1995), to be controlling here.  In the case at bar, the jury found that a Title VII and

PHRA violation had occurred. As noted by the *McKennon* Court, violations of this type:

> [M]ust be deterred and compensated without undue infringement
> upon the employer's rights and prerogatives. The object of compensation
> is to restore the employee to the position he or she would have been in
> absent the discrimination, . . . but that principle is difficult to apply with
> precision where there is after-acquired evidence of wrongdoing that would
> have led to termination on legitimate grounds had the employer known
> about it.

*McKennon,* 513 U.S. at 362 (internal citation omitted)." *Risk II*, p. 1-2.

The Court also granted pre-judgment interest, but denied plaintiff's requests for

reinstatement and other equitable relief. *Id.*, p. 2-3.

On May 16, 2008, the Court entered judgment for plaintiff against defendant for

$100,000 on the jury's verdict and for $18,091.03 in back pay and prejudgment interest.  In due

course, defendant filed and served a timely motion to renew its request for the entry of judgment

as a matter of law in its favor or, in the alternative, for a new trial.

## B.    STATEMENT OF THE FACTS

Because the Court is familiar with the case; because a statement of the pertinent facts

depends largely on the applicable scope and standard of review; and because, as discussed next,

the scope and standards of review vary, this brief discusses the pertinent facts in the context of

the particular issues raised by defendant's post-trial motion.

## III.    STATEMENT OF THE STANDARDS OF REVIEW

### A.    MOTION FOR JUDGMENT AS A MATTER OF LAW

Post-trial and appellate review of a denial of a motion for judgment as a matter of law is

plenary. *Lippay v. Christos*, 996 F.2d 1490, 1496 (text and n. 6) (3d Cir. 1993).  Both the trial

court and the appellate court apply the same standard. *Lightning Lube, Inc. v. Witco Corp.*, 4

F.3d 1153, 1166 (3d Cir. 1993).  The reviewing court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). The court is to determine if the evidence was or was not sufficient for a jury reasonably to find liability. *Lightning Lube*, 4 F.3d at 1166.

A scintilla of evidence will not enable the non-movant to survive a Rule 50 motion. *Id.* "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Id.* (internal quotation omitted).

Moreover, in determining whether or not there is a legally sufficient evidentiary basis for the verdict, the court should not consider erroneously admitted evidence. *Lippay*, *supra*, 996 F.2d at 1500-1501; *Lightning Lube*, *supra*, 4 F.3d at 1199-1200; *Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000).

### B.    MOTION FOR A NEW TRIAL

#### 1.    EVIDENTIARY RULINGS

Trial courts have considerable discretion in deciding evidentiary issues and those decisions will not be found erroneous unless the court abused its discretion in making them, or unless the decision was based on a legally erroneous construction or application of a legal standard. *Rinehimer v. Cemcolift*, 292 F.3d 375, 382-383 (3d Cir. 2002).

"An abuse of discretion arises when the trial court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact. An abuse of discretion can also occur when no reasonable person would adopt the district court's view.  [A reviewing court] will not interfere with the [trial] court's exercise of discretion unless

6

there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (internal quotations and citation omitted).

### 2.    JURY INSTRUCTIONS

As with rulings on evidence, trial courts generally have broad discretion in charging a jury. *Bennis v. Gable*, 823 F.2d 723, 727 (3d Cir. 1987).  However, where the resolution of a jury instruction issue turns on "statutory construction involving the interpretation and application of legal precepts," post-trial and appellate review is plenary.  *United States v. McGill*, 964 F.2d 222, 235 (3d Cir. 1992).  The appropriate standard of review is determined by the nature of the objection made to the jury instruction.  *United States v. Zehrbach*, 47 F.3d 1252, 1260 (3d Cir. 1995).  When the objection is that the trial court applied incorrect legal standards, plenary review applies.  *Zehrbach*, 47 F.3d at 1260-61.

### 3.    HARMLESS ERROR

"Federal Rule of Evidence 103(a) provides that an evidentiary ruling is not reversible error 'unless a substantial right of a party is affected . . . .' Fed. R. Evid. 103(a).  Under this test, a reviewing court should affirm the District Court despite the error if the reviewing court believes 'that it is highly probable that the error did not contribute to the judgment . . . .' *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 924 (3d Cir. 1985) (quoting *Government of the V.I. v. Toto*, 529 F.2d 278, 284, 12 V.I. 620 (3d Cir. 1976))."  *Renda v. King*, 347 F.3d 550, 556 (3d Cir. 2003).

Likewise, if the trial court's instructions were legally incorrect, the reviewing court must grant a new trial unless the erroneous instructions were merely harmless error.  Harmless error can only be found when there is a high probability that the error did not substantially affect

7

defendant's rights or affect the outcome of the case.  *Lippay*, *supra*, 996 F.2d at 1500; *Advanced Medical, Inc. v. Arden Medical Sys., Inc.*, 955 F.2d 188, 199 (3d Cir. 1992); *McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 928 (3d Cir. 1985).

A party is severely impaired when it is prohibited from presenting its theory of a case in a comprehensive and organized manner at trial, even if it has managed to slip a few references into the record.  *Moyer v. United Dominion Indus.*, 473 F.3d 532, 545 (3d Cir. 2007).

## IV.   ARGUMENT

### A.   EVIDENCE THAT SHOULD NOT HAVE BEEN ADMITTED AT TRIAL

#### 1.   INTRODUCTION

Several significant items of evidence must be considered as erroneously admitted at trial, both in terms of what should not be considered in determining whether or not there is a legally sufficient evidentiary basis for the verdict, and in terms of whether defendant is entitled to a new trial.

Included in this joint category are:  the admission of evidence, argument, and jury instruction regarding the defendant's alleged violation of the Police Tenure Act; the admission of evidence, argument, and jury instruction regarding plaintiff's cross pin; the admission of evidence and argument contesting plaintiff's decertification; evidence and argument regarding his off-duty expression of an opinion to Amy Prevost about what Borough Council might do; the introduction of Dan Johnson's testimony after both plaintiff and defendant had completed the presentation of their cases; and, the evidence and adverse inference instruction regarding the non production of audiotapes.

2.        **THE POLICE TENURE ACT**

Plaintiff did not plead the Pennsylvania Police Tenure Act in any of his complaints, and he did not he raise the Act during the Court's in limine hearing.  Instead, plaintiff injected the Act and the defendant's failure to follow the seniority protocol of Section 813 of the Act during trial. (N.T. 3/24/08, p. 19-20.)  That tactic prompted defendant to object on the ground that the Act, including Section 813, did not apply to defendant or to plaintiff as a part-time police officer, and it ignited a discussion and further testimony, some in the jury's presence and some outside the jury's presence.  (N.T. 3/24/08, p. 19; N.T. 3/25/08, p.4, et seq.; N.T. 3/26/08, p.105.)

Ultimately, believing that either the Act or the civil service section of the Borough Code had to apply and that Section 813 could be construed separately and independently from the Act's applicability (Section 811) and other Sections, the Court held that it would take judicial notice that the seniority protocol of Section 813 applied to defendant and to plaintiff, and that the jury would be instructed on that holding and that, while it was not being asked to determine if the seniority protocol were violated, the jury could find that defendant's explanation for terminating plaintiff was a cover-up or a pretext, both in connection with plaintiff's discrimination claims and in connection with his retaliation claims, if the jury found that the seniority protocol was not followed in this case.  (N.T. 3/25/08, p. 189-191, N.T. 3/26/08, p.201-207.)  The Court so instructed the jury.  (N.T. 3/27/08,  p.85.)

The ruling, evidence, and instruction on the Police Tenure Act should not have been part of the trial or included in determining whether plaintiff's evidence was legally sufficient to support the jury's verdict, because the seniority protocol of Section 813 is part of the Act and the Act simply does not apply to this case.

Section 813 cannot be construed or applied except as part of the Police Tenure Act. On the larger scale, Section 813 is but one of the six sections (811 through 816) that comprise Article IX ("REMOVAL OF POLICEMEN IN CERTAIN BOROUGHS AND TOWNSHIPS") of Chapter 8 ("PUBLIC OFFICERS AND EMPLOYEES") of Part I ("GENERAL MUNICIPAL LAW") of Title 53 ("MUNICIPAL AND QUASI-MUNICIPAL CORPORATIONS") of Purdon's Statutes. Section 813 does not exist by itself.

On the smaller scale, Section 813 indicates both that it is part of the Act as a whole and that it applies only where the Act applies. On that point, Section 813 addresses "[r]eduction of number of police" by "**any township of the second class, or any borough or township of the first class within the scope of this act**." 53 P.S. § 813 (emphasis added). The "scope of this act" is stated in Section 811, which is titled "Application of law." Section 811 provides that the Act, including Section 813, "shall apply to each **township of the second class, to each borough and township of the first class <u>having a police force of less than three members</u> *and not subject to*" the police and fire civil service sections of "'The Borough Code', and their amendments, *nor to*" the corresponding civil service sections of the "The First Class Township Code", and their amendments." 53 P.S. § 813 (emphasis added).

Because defendant's police force had more than three members, before, at the time of, and after the termination of plaintiff's employment, the Act did not apply.

On the other hand, the police and fire civil service section of the Borough Code, which has a seniority part (53 P.S. § 46190) also did not apply. That civil service section is found in Subdivision J ("CIVIL SERVICE FOR POLICE AND FIREMEN") of Article XI ("POWERS, DUTIES AND RIGHTS OF APPOINTED OFFICERS AND EMPLOYEES") of the Borough Code, which comprises Chapter 91 ("THE BOROUGH CODE") of Part VI ("BOROUGHS") of

Title 53 of Purdon's Statutes ("MUNICIPAL AND QUASI-MUNICIPAL CORPORATIONS"). Subdivision J "**shall not apply to any borough having a police force of less than three members**." 53 P.S. § 46171 (emphasis added).

However, as used in Subdivision J, a "police force" "shall mean a police force organized and operating as prescribed by law, the members of which devote their normal working hours to police duty or duty in connection with the bureau, agencies and services connected with police protection work, and who are paid a stated salary or compensation for such work by the borough." 53 P.S. § 46195. Moreover, "police force" as used in Subdivision J "shall not include … (4) Any extra police serving from time to time or on an hourly or daily basis." *Id.*

Given the definition of "police force" that specifically applies to Subdivision J, the Court properly ruled that Subdivision J did not apply to this case (N.T. 3/25/08, p.190), because defendant's "police force," excluding its part-time, hourly officers such as plaintiff, had fewer than three salaried officers who devoted his normal working hours to police duty, and Subdivision J "**shall not apply to any borough having a police force of less than three members**." 53 P.S. § 46171; 53 P.S. § 46195.

However, that ruling did not mean that the Police Tenure Act, and more specifically the seniority protocol of Section 813, applied. In the particular facts of this case, neither the Act nor Subdivision J applied. That situation reflects an intent on the part of the General Assembly not to provide part-time police officers such as plaintiff with the tenure and other rights afforded to full time salaried officers, a rational distinction that is generally understood by municipal subdivision solicitors (N.T. 3/26/08, p.106).

*Elmore v. Cleary*, 399 F.3d 279 (3rd Cir. 2005), buttresses this tenure analysis. In that case, plaintiff claimed a violation of her due process rights, because she was fired from her job as

11

an office manager with Huntington Township without notice or a hearing or just cause, despite the fact that the Township's "Personnel Policy Handbook" provided that the "township shall take no disciplinary action against an employee without just cause," and also provided a protocol for "progressive disciplinary action" and a grievance process. *Id.* at 280. Key to Elmore's claim, of course, was whether Pennsylvania law vested her with a right to notice, hearing, and protection from termination except for just cause, or whether she was simply an at-will employee without those protections. *Id.* at 282.

On that point, the Court of Appeals recognized that, "under controlling Pennsylvania law, a 'public employee takes his job subject to the possibility of summary removal by the employing authority. He is essentially an employee-at-will.' Stated otherwise, a public employee in Pennsylvania generally serves at the pleasure of her employer and thus has no legitimate entitlement to continued employment." *Id.* at 282 (citations omitted).

Moreover, the Court pointed out that "[a] **local government in Pennsylvania cannot provide its employees with tenure status unless there exists express legislative authority for doing so**. As the Pennsylvania Supreme Court has stated, 'tenure in public employment, in the sense of having a claim to employment which precludes dismissal on a summary basis is, where it exists, a matter of legislative grace.'" *Id.* at 282-283 (citations omitted; emphasis added). As demonstrated above, an accurate analysis of the Police Tenure Act and of the Borough Code's Subdivision J reveals that there exists no *express* legislative authority to confer tenure status to a part-time police officer like plaintiff in a police force like defendant's.

*Petras v. Union Township*, 28 Pa. D. & C.2d 687 (Washington 1962), aff'd on trial court's opinion, 409 Pa. 416, 187 A.2d 171 (1963), reinforces the conclusion and the rationale that the Police Tenure Act does not apply to plaintiff.

First, *Petras* noted that the Act applied only to police forces of less than three members. *Petras*, *supra*, 28 Pa. D. & C.2d at 690-691.  As discussed above, defendant's police force was not covered by the Act had because it had more than three members.

Second, at issue in *Petras* was whether the Act applied, and whether the plaintiff could be removed under Section 812 of the Act and was entitled to a hearing under Section 814 of the Act.  Of note, considering the discussions at trial in this case about the term "regular full time police officer" (N.T. 3/25/08, p.8-16), Section 814, like Section 813, did not use the term "regular full time police officer" that was used in Section 812 regarding removals, suspensions, and reductions in rank.  Nevertheless, *Petras* construed the Act as intending job security and to grant tenure "to prevent the removal of persons like Petras for any but good and valid reasons" (*Id.* at 691), and the determination of whether Petras qualified for protection under the Act turned on whether he was a full time police officer, and the court held that he did, because he satisfied the test of being "'available for full employment,' that is on call at any and all times." *Id.* at 693. In contrast. plaintiff here was not a full time police officer under the Act, because he had a primary, full time job.

*Mullen v. Borough of Parkesburg*, 132 Pa. Cmwlth. 321, 572 A.2d 859 (1990), further strengthens this analysis.

First, in referring to the Act as consisting of Sections 811 through 816, *Mullen* underscores that Section 813 cannot be regarded as completely free-standing.  *Id.*, 132 Pa. Cmwlth. at 323, 572 A.2d at 860.

Second, *Mullen* confirms defendant's view that Section 813 was inapplicable even though it did not mention the size of the force or the full time status of the officer, because, although Mullen "claim[ed] that he was entitled to a hearing in accordance with Section 4 of the Act, 53

13

P.S. § 814," which also did not mention the size of the police force or the full time status of the employee, the Commonwealth Court held that Sections 811 and 812, which do speak of the size of the force and the full time status of the officer were relevant and also had to be considered. *Id.*, 132 Pa. Cmwlth. at 324, 572 A.2d at 861 ("Sections 1 and 2 of the Act, 53 P.S. §§ 811 and 812, are relevant to this issue.").

Third, *Mullen* held that the plaintiff in that case was not protected under the Act, since he, like plaintiff here, was not a "regular full-time police officer" as mentioned in Section 812, and because the police force consisted of more that three police officers as mentioned in Section 811. *Id.*, 132 Pa. Cmwlth. at 324-325, 572 A.2d at 861.

*Albrechta v. Borough of White Haven*, 810 F. Supp. 139 (M.D. Pa. 1992), upon which the Court based its decision that the Police Tenure Act applied and that it could be argued and used by the jury to find pretext (N.T. 3/25/08, p.189-190; N.T .3/26/08, p. 201-207; N.T. 3/27/08, p.85), does not alter the above analysis or support the Court's ruling and its effects in this case. Closely read with respect to the applicability of the Act, *Albrechta* supports the conclusion that the Act should not have been applied in this case.

To determine whether the Act applied to the plaintiff's claim that he was deprived of a property right when he did  not receive a pretermination hearing, *Albrechta* turned to Section 811 of the Act and the Commonwealth Court's discussion of that Section in *Mullen*.  *Albrechta* noted that the Commonwealth Court "found that the plaintiff, Mullen, did not overcome the concerns of 53 P.S. § 811, 'which limits coverage to police forces consisting of less than three members'" because it "found that 'other than Mullen, the Borough employed only a Chief of Police and a Sergeant.  *It directly follows that Mullen, whether full-time or part-time, constitutes the third member of the Borough's police force,*' making the Act inapplicable." *Id.*, 810 F. Supp. at 143

14

(citation omitted; emphasis in original). On the basis of that guidance, *Albrechta* **held "that for the Police Tenure Act to be applicable, White Haven's police force must have consisted of less than three members, whether full-time or part-time."** *Id.* (emphasis added). Because White Haven admitted that it had "anywhere from five to seven part-time police officers during Albrechta's employment as a full-time Police Chief," *Albrechta* concluded that the Act did not apply. *Id.*

Following that portion of *Albrechta*, and certainly following *Petras* and *Mullen*, this Court should have held that the Act did not apply and it should have precluded evidence, argument, and jury instruction about the seniority protocol of Section 813.[1] Consequently, those aspects of the case should be disregarded in determining defendant's renewed motion for judgment as a matter of law. Their effect in entitling defendant to a new trial in the event that judgment is not entered in its favor is discussed in a later section of this brief.

### 3.    THE CROSS PIN

Despite the Court's clear and correct ruling in *Risk I* that dismissed plaintiff's claims based on Chief Robert's directives that plaintiff cease wearing a cross pin on his uniform, the Court nonetheless permitted plaintiff to introduce considerable evidence on the cross pin issue.

---

[1]    Although *Albrechta* also held that the Borough Code applied, that holding does not disturb the contrary holding of this Court that the Code does not apply to this case. *Albrechta* did not analyze the applicability of the Code, especially the provisions discussed above which, if properly considered, would have led to the conclusion that the Code also does not apply. Moreover, in finding that the plaintiff had a property right and was entitled to a hearing, Albrechta relied on the Commonweatlth Court's decisions in *Roth v. Borough of Verona*, 460 A.2d 379 (Pa. Cmwlth. 1983), and in *Elmer v. Board of Commissioners of Wilkins Township*, 552 A.2d 745, 746 (Pa. Cmwlth. 1989). However, those decisions were implicitly overruled by the Pennsylvania Supreme Court in *Upper Makefield Township v. Pennsylvania Labor Relations Board*, 753 A.2d 803 (Pa. 2000), *Short v. Borough of Lawrenceville*, 696 A.2d 1158 (Pa. 1997), and *Pipkin v. Pennsylvania State Police*, 693 A.2d 190 (Pa. 1997). *Olson v. Borough of Avalon*, 811 A.2d 66 (Pa. Cmwlth. 2002). Furthermore, although *Albrechta* has been cited many times, it has never been cited as accurate authority that Subdivision J of the Borough Code applies to a police force that has less than three full-time salaried members.

That evidence included testimony from plaintiff about why he wore the cross pin and what it meant to him (N.T. 3/25/08, p.143); testimony from Chief Roberts as to when and why he asked plaintiff to remove the pin (N.T. 3/26/08, p.10), followed by sharp cross-examination to undermine the Chief's authority, correctness, and credibility and to show his frustration with plaintiff when he continued to wear the pin despite the instruction not to wear it (N.T. 3/26/08, p. 64-66); and interrogation about how neither the Mayor nor members of the Borough Council were troubled or saw any problem with plaintiff's wearing the pin on his uniform (Id.).

The evidence regarding the cross pin was not trivial in amount and it played a central role in plaintiff's presentation to the jury on both of his claims and a top role in plaintiff's retaliation claim. (N.T. 3/18/08, p. 46 ("And this issue of the cross, again, a lot of our retaliation case goes to the complaint about the not being able to wear the cross."); N.T. 3/24/07, p.78, et seq.; N.T. 3/25/08, p. 123, 143; N.T. 3/26/08, p. 64, 97, 161, 171; N.T. 3/27/08, p. 41, et seq.)

In addition to admitting substantial evidence and allowing argument to the jury on the cross pin, the Court instructed the jury that, although defendant could prohibit its police officers from wearing such a religious symbol without infringing on their constitutional rights, the jury could nonetheless "consider the fact that the Chief of police asked Mr. Risk to remove his cross pin as evidence of discriminatory animus."  (N.T. 3/27/08, p. 86-87.)

However, once the Court dismissed Counts I through IV of plaintiff's complaint, which centered on the cross pin, those claims and the evidence, contentions, and potential jury issues connected to those claims should have dropped out of the case entirely.  The cases that prompted and supported the Court's holding that "**[p]laintiff Risk can premise no claim of Constitutional violation on a restriction of his right to wear a symbol of his Christian beliefs on the lapel of his police uniform while performing his duties in the community** with the significant

16

governmental authority invested by his office," (*Risk I*, *supra*, p. 8), should also have prevented plaintiff from litigating and having the jury consider the cross pin issues adversely to defendant. Those cases underscore not only that plaintiff had no right to wear the cross pin on his uniform, but also that defendant had an absolute right to direct him not to wear the pin.

Thus, among other things, the jury did not need to learn and should not have heard or considered that plaintiff wore a cross pin on the lapel of his police uniform "as a sign of his strong Christian beliefs" (*Risk I*, *supra*, p. 2); that Chief Roberts "ordered Risk to stop wearing a cross on his police uniform[, and] Risk protested to both the Borough Council President and Dan Johnson, the Council Police Department liaison, but Roberts insisted" (*Id.*, p. 2); or that "on December 7, 2004, [Risk's] counsel corresponded with Chief Roberts, [with copies to each member of Borough Council,] requesting that Risk be permitted to wear his cross" (*Id.*, p. 3 text and n. 3).

Instead, plaintiff should have been allowed to premise his causes of action on religious discrimination and/or retaliation under Title VII and the PHRA, not on his alleged but baseless right to wear a cross on his uniform, but rather on the basis of his allegedly "(a) disfavorable treatment on and/or removal from the schedule, and/or (b) selection for termination." (*Risk I*, *supra*, p. 11-12; footnote omitted.)

The cross pin issue should never have entered the courtroom door. To allow evidence on that issue and to allow the jury to consider that evidence against defendant was contrary to the law and to the Court's earlier ruling. Consequently, those aspects of the case should be disregarded in determining defendant's renewed motion for judgment as a matter of law. Moreover, as discussed later in this brief, the Court's instruction that allowed the jury to find unlawful religious discrimination in what Chief Roberts could lawfully do and where plaintiff

had no lawful right was not only contrary to the law and illogical, but also tantamount to directing a verdict for plaintiff.

### 4.     PLAINTIFF'S DECERTIFICATION

Plaintiff's testimony about his decertification was also erroneously allowed and should be excluded from the Court's consideration of the trial record to determine whether the jury's verdict is supported by legally sufficient evidence.

There was never a dispute in this case that, on September 13, 2007, the Pennsylvania Municipal Police Officers' Education and Training Commission ("Commission") adopted verbatim the findings of fact and conclusions of law of its Hearing Examiner and revoked plaintiff's certification as a police officer because of the "[s]ubmission to the Commission of a document that the police officer knows contains false information including fraudulent application," and because the "certification [was] issued in error."  37 Pa. Code §§ 203.14(a)(7) and (8).  See also, *Salters v. Pa. State Police Mun. Police Officers' Educ. & Training Comm'n*, 912 A.2d 347 (Pa. Cmwlth. 2006) (affirming revocation on same §§ 203. 14(a)(7) and 203. 14(a)(8) grounds).

More recently, the Commonwealth Court affirmed the Commission's decision on May 29, 2008, and plaintiff has not appealed that decision.

As defendant correctly established in its response to plaintiff's motion regarding after acquired evidence and in its motion to dismiss or stay, the Commission's decision impacted this case in several ways.  While some of those aspects, such as plaintiff's qualification and his entitlement to back pay, are discussed later in this brief, at this point the focus falls on the Court's decision to allow plaintiff to give his version and effectively contest or question the validity or fairness of the Commission's decision (and allow the jury to do the same).  That decision was

legally incorrect and what flowed from it should be disregarded in the assessment of defendant's motion for judgment as a matter of law.

Although on appeal before and during trial, the Commission's decision was fully effective not only to revoke plaintiff's certification *ab initio*, but also to foreclose plaintiff under the doctrine of collateral estoppel or issue preclusion from contesting in this Court the Commission's decision and the findings of fact and legal conclusions that led to and were incorporated into that decision.

By federal statute, "judicial proceedings … shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State … ."  28 U.S.C. §1738.  Therefore, when a party seeks to rely on a state court judgment to preclude relitigation of the same issues in federal court, a federal court must look to state law to determine the extent to which the state would give its own judgment collateral estoppel effect.  *Davis v. United States Steel Supply*, 688 F.2d 166, 170 (3d Cir. 1982) (en banc), *cert. denied*, 460 U.S. 1014 (1983).

Although made by an administrative entity, the Commission's decision in this case is entitled to preclusive effect, because the Commission acted in a judicial capacity through its Hearing Examiner, provided plaintiff an adequate opportunity to litigate the facts and issues, and resolved disputed issues of fact properly before it.  *United States v. Utah Construction & Mining Co.*, 384 U.S. 394, 422 (U.S. 1966).

Additionally, under established Pennsylvania law, the pendency of an appeal does not undermine or suspend the immediate preclusive affect of a criminal, civil, or administrative decision.  *Shaffer v. Smith*, 543 Pa. 526, 673 A.2d 872 (1996) (criminal); *Helmig v. Rockwell Mfg. Co.*, 389 Pa. 21, 131 A.2d 622, cert. denied, 355 U.S. 832 (1957) (civil); *In re Wallace's*

*Estate*, 316 Pa. 148, 174 A. 397 (1934) (civil); *Bassett v. Civil Service Commission of Philadelphia*, 100 Pa. Cmwlth. 356, 514 A.2d 984 (1986) (administrative); *Philadelphia Electric Co. v. Pennsylvania Public Utility Commission*, 61 Pa. Cmwlth. 325, 332, 433 A.2d 620, 625 (1981) (administrative).

Consequently, the Commission's decision was binding on plaintiff, and he should not have been allowed to contradict, explain away, dispute, or otherwise undermine the findings and conclusions endorsed and adopted by the Commission.  Additionally, plaintiff's evidence along those lines should not have been aired to or considered by the jury, and that evidence should be disregarded by this Court in determining defendant's renewed motion for judgment as a matter of law.

## 5.   AMY PREVOST'S CONVERSATION WITH CHIEF ROBERTS

Plaintiff's lead-off witness was Amy Prevost.  (N.T. 3/24/08, p. 47.)  Besides mocking Chief Roberts as a "big fan of fine cuisine" because he regularly ate TV dinners (*Id.*, p. 48), plaintiff sought to establish through Ms. Prevost that, as of November 24, 2004 (months before Borough Council decided on March 5, 2005 to complete its fiscally motivated restructuring of the Police Department by terminating the services of five part-time officers), the decision had already been made to terminate plaintiff's employment because working on weekends interfered with his church attendance.  Additionally, plaintiff elicited Ms. Prevost's commentary that the Chief laughed when Ms. Prevost remarked that "it wasn't a good reason to get rid of a good officer just because they go to church."  (*Id.*, p. 49-51.)  Plaintiff also called Ms. Prevost to authenticate the note that she wrote on December 3, 2004 about that incident (*Id.*, p. 52), which

was included in the letter sent by Attorney Colantonio on December 7, 2004 to Chief Roberts with copies to the Mayor and each member of Borough Council.[2]

The Court should not have denied defendant's motion in limine to exclude Ms. Prevost's testimony and statement concerning her conversation with Chief Roberts and his "personal opinion" (N.T. 3/24/08, p. 56) about which police officers might be retained or let go, and the Court should exclude that evidence from its consideration of defendant's renewed motion for judgment as a matter of law.

What Ms. Prevost said Chief Roberts said was inadmissible hearsay, because it was not offered just to establish that Chief Roberts said what Ms. Prevost said he said (and later acknowledged in court), but rather to prove that plaintiff was terminated because of his religion. Thus, the statement was offered to prove the truth of the matter asserted.  It was, therefore, inadmissible.

Moreover, Chief Roberts had no authority to hire or to fire any of defendant's police officers, and he recused himself from the selection process.  There is no evidence that he was

---

[2]     Plaintiff also had Ms. Prevost recount an incident that occurred when plaintiff was not present in which Lt. Murray "made light of [plaintiff's] religion" by remarking to Officer Hoffman "to make sure that he carries Tylenol with him, just so that Officer Risk didn't preach about church and God.  That he would need the Tylenol for a headache, I guess." (N.T. 3/24/08, p. 52-53.)  That single remark, made in plaintiff's absence, hardly constitutes legally sufficient evidence for the Court's charge to the jury that it might find -- or a jury finding -- a discriminatory work place culture indicative of pretext.  (N.T. 3/27/08, p. 84-85.)  Isolated incidents of discriminatory comments or conduct is not sufficient to establish a hostile work environment.  *E.g.*, *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("'simple teasing,' . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'"); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("'mere utterance of an . . . epithet which engenders offensive feelings in an employee,' . . . does not sufficiently affect the conditions of employment to implicate Title VII").  Plaintiff introduced no other evidence about the  anti-religious culture of plaintiff's work place.

actually involved in that process.  Beliefs by others that Chief Roberts had input do not suffice, because they are simply beliefs without a basis in fact.

Similarly, the "personal opinion" that Chief Roberts expressed to Ms. Prevost in November of 2004 may have been a rather accurate forecast of what happened in March of 2005, as plaintiff's counsel mapped out with Ms. Prevost (N.T. 3/24/08, p.56), but it was simply a personal opinion about what might happen, not a statement of fact based on personal knowledge about what those who were actually involved in the decisions yet to be made would do.

A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge on the matter, Fed.R.Evid. 602, and "[t]here is no reason that a hearsay declarant would be exempt from the requirement that his assertions be based in personal knowledge when the affiant himself is held to that standard.  If anything, there is a greater concern that a hearsay declaration is not based on personal knowledge than a statement of the affiant himself."  *Fitzpatrick v. Nat'l Mobile Television et al.*, 364 F. Supp. 2d 483, 496 (M.D. Pa. 2005).  Accordingly, Chief Roberts' opinion on the subject of the retention of specific police officers could not have been based on personal knowledge.

Moreover, to the extent that what Chief Roberts said to Ms. Prevost was purportedly based on information given to Chief Roberts, Ms. Prevost did not know and plaintiff never proved who that source was.  Consequently, Ms. Prevost's statement and testimony should not have been admitted under *Fitzpatrick*, or under *Carden v. Westinghouse Electric Corp.*, 850 F.2d 996 (3d Cir. 1988), and *Armbruster v. Unisys Corp.*, 32 F.3d 768 (3d Cir. 1994), because those statements were never factually based nor factually linked to a decision maker.  "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given

great weight, particularly if they were made temporally remote from the date of decision." *Armbruster*, 32 F.3d at 779 (citation omitted).

Accordingly, the Court should have determined that Chief Robert's statement did not constitute overt evidence of discriminatory animus, and it should have precluded the testimony and statement of Ms. Prevost.  Had the Court so ruled, the testimony of Chief Roberts about the same episode would never have been developed.  Consequently, the Court should not consider any of the evidence related to the conversation between Ms. Prevost and Chief Roberts in its determination of defendant's renewed motion for judgment as a matter of law.  As with other items that overlap that motion with defendant's motion for a new trial, the new trial implications of the Court's allowing the jury to hear about the Prevost-Roberts guessing game is discussed later in this brief.

6.     **THE TESTIMONY OF DAN JOHNSON**

Plaintiff subpoenaed Dan Johnson to testify as a witness on plaintiff's behalf, and he forced Mr. Johnson to sit in the hallway outside the courtroom for two days while plaintiff presented his case in chief.  (N.T. 3/25/08, p. 192; 3/26/08, p. 138)  However, plaintiff rested his case without calling Mr. Johnson.  (*Id.*)  Apparently, plaintiff's trial strategy was to preoccupy Mr. Johnson, but not call him to testify in the hope that defendant would call him.  (N.T. 3/26/08, p. 138-139.)  When that did not occur, and plaintiff's motion for judgment as a matter of law was denied, plaintiff scrambled to obtain testimony from Mr. Johnson's deposition, even though, as plaintiff's attorney acknowledged, plaintiff had already brought out that testimony during his questioning of other witnesses.  (N.T. 3/25/08, p. 198; 3/26/08, p. 138, 139-140.)

Oddly, plaintiff sought to place the blame for his predicament on defendant, accusing defendant's trial counsel of preventing plaintiff's counsel from speaking to Mr. Johnson and for

releasing Mr. Johnson from plaintiff's subpoena.  (N.T. 3/26/08, p. 143; see also, *Id.* at 180.)
However, nothing defense counsel said about plaintiff's contact with defense witnesses prevented
plaintiff's attorney from courteously letting Mr. Johnson (or defense counsel) know that plaintiff
actually would not call him as a witness despite the subpoena and that he could leave.  (N.T.
3/27/08, p. 116-19.)  What is more, plaintiff had rested his case, indicating that he was finished
calling witnesses, and thereby indicating that there was no reason for Mr. Johnson to continue his
hallway vigil.

Under the guise of presenting "rebuttal" evidence, and knowing that defendant would be
forced to compel an ailing Mr. Johnson to again return to the courthouse in order to respond to
plaintiff's "rebuttal" evidence, the Court allowed plaintiff to introduce a selected portion of the
deposition of Mr. Johnson into evidence.  (N.T. 3/26/08, p. 142, 144.)  That testimony related to
plaintiff's case in chief on the central issue that plaintiff was fired because of his religion.  In the
deposition excerpts read by plaintiff's attorney to the jury, Mr. Johnson stated that "they" went by
the work schedules to determine the police officer's availability; that plaintiff told him that he
"couldn't work because he has to drive a school bus one day and other [sic] day he had to go
church," and that "[w]e needed him during church hours and he wouldn't work them [sic]
schedules."  (N.T. 3/26/08, p. 147-148.)

However, plaintiff offered no acceptable reason why he did not call Mr. Johnson to the
stand in his case in chief.  Nor did plaintiff offer evidence that Mr. Johnson conveyed to his
fellow Borough Council members his understanding --- or, from plaintiff's perspective,
misunderstanding – that plaintiff would not work if work presented some interference with his
going to church.

Although defendant had the opportunity to introduce additional portions of Mr. Johnson's deposition testimony, that option was unreal and unfair.  Defendant lost the opportunity it would have had to cross-examine Mr. Johnson in full, in person, and in front of the jury, if plaintiff had called him when he was in the courthouse and under subpoena.  (N.T. 3/26/08, p. 143.)  Plaintiff never demonstrated that defendant could have effectively used additional portions of Mr. Johnson's deposition to respond to or to explain the excerpts that the plaintiff selected. Defendant's only other option was to bring Mr. Johnson back to court while he was recovering from surgery, an option that was neither fair nor feasible.  (N.T. 3/26/08, p. 141-142, 144.)

The Court should not have allowed plaintiff to introduce the excerpts from Mr. Johnson's deposition.  There was no cogent reason to allow plaintiff to escape the natural consequences of his own trial tactic.  Nor was there a legitimate reason to shift the problem to defendant.

Accordingly, in its assessment of defendant's motion for judgment as a matter of law, the Court should disregard Mr. Johnson's deposition testimony.  Should the Court deny that motion, the impact of the introduction of that testimony should be considered in connection with defendant's motion for a new trial, as mentioned later in this brief.

### 7.   THE COUNCIL MEETING AUDIOTAPES

The Court should not have provided plaintiff with the evidentiary adverse inference that whatever may have been on the audiotape of the Borough Council meeting at which the vote was taken to discontinue the services of five part-time officers, including plaintiff, was substantively adverse to defendant and conversely substantively supportive of plaintiff's case.

Plaintiff made his request for the adverse inference instruction during the Court's jury charge conference.  (N.T. 3/26/08, p. 188-191.)  The discussion resumed the next day, when the Court decided to give the instruction.  (N.T. 3/27/08, p. 12-14.)  The topic focused on defendant's

production only of Borough Council meeting minutes in response to a request that could and was reasonably read in the alternative.  (N.T. 3/26/08, p. 188 ("please provide copies of any and all Burgettstown meeting minutes, tapes, **or** transcripts from October [2004] to the present") (emphasis added).)  The defendant's response attached the minutes and said "see attached," but no tapes were mentioned or provided.  (*Id.* at 188-189.)  Although plaintiff's attorney admitted that the contents and benefits of the tapes were unknown  (*Id.* at 190 ("I don't know what they say.  They may have been very helpful to us or or [sic] not.  I just don't know.")), he requested an adverse inference instruction.  (*Id.* at 191, 193-194.)

Of note, the request was made two days after Ms. Church testified that she believed that the audiotape for that meeting still existed three years later.  (*Id.* at 193.)  Although plaintiff's counsel may "even gave her time to bring it," (*Id.* at 193), he did not ask for it then or ask for a recess or time to listen to the tape.  Nevertheless, the Court decided to give instruction.  (*Id.* at 194-195.)  No other option was considered.

Even when evidence is destroyed or "spoliated," the appropriate sanction requires a determination of three factors:  (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party, and (3) the availability of a lesser sanction that will protect the opposing party's rights and deter future similar conduct. *Schmid v. Milwaukee Electric Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994).  See also, *Schroeder v. PennDOT*, 710 A.2d 23, 27 (Pa. 1998) (expressly adopting the *Schmid* factors  in determining appropriate sanctions for spoliation in Pennsylvania).  None of those factors was discussed before the Court decided to give the adverse inference instruction.

Defendant's counsel was unaware of the existence of the tapes, and the Court accepted counsel's word.  (N.T. 3/26/08, p. 188.)  However, the defendant's response may have been due

to an innocent interpretation of the ambiguously worded request, and a belief that the meeting minutes would suffice.  Most important, there is no evidence at all that defendant was trying to hide a proverbial smoking gun or trying to dupe plaintiff.  There was no evidence or even an attempt to establish that the tapes were intentionally withheld in a way that "indicates fraud and a desire to suppress the truth."  *Gumbs v. International Harvester, Inc.*, 718 F.2d 88, 96 (3d Cir. 1983).

Additionally, there was no exploration of what prejudice plaintiff may or may not have actually sustained.  Plaintiff never pursued the issue in discovery, even though, as the Court observed in a different but retrospectively pertinent context, "everybody knows that minutes and tapes are completely different" and "[m]inutes never give you the full text of what happened at a meeting."  (N.T. 3/26/08, p. 196.)   As noted above, even when Ms. Church stated that she believed that the tape existed, plaintiff took no step to secure it and listen to it.  Thus, there was no overt and objective indication that the tape had any importance to plaintiff's case.  Otherwise, one would expect that he would have made a genuine opportunity to obtain it and listen to it.

Instead, plaintiff waited until the case was closed and then moved for, and obtained, a significant advantage:  securing a judicially endorsed inference by the jury that the audiotape would provide facts showing that Borough Council actually singled out plaintiff for termination on the basis that he wanted to go to church and, on plaintiff's retaliation claim, that Borough Council in fact retaliated against plaintiff on the basis of an anti-religious motive.  In granting plaintiff's request, the Court considered no other course.  It jumped to the conclusion that defendant intentionally sought to hide something and that the tape contained the smoking gun of religious discrimination that was omitted from the meeting minutes.  Compounding that

monumental leap, the Court permitted the jury to provide a significant finding for plaintiff that was not warranted by the other evidence and circumstances of the case.

Thus, the inference sought by plaintiff and permitted by the Court should not be considered in the Court's assessment of defendant's renewed motion for judgment as a matter of law.   In the event that that motion is denied, the adverse inference instruction should be considered in connection with defendant's alternative motion for a new trial, as discussed later in this brief.

## B.   DEFENDANT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW

### 1.   PLAINTIFF WAS NOT QUALIFIED

As the Court and the parties agreed, plaintiff's burden of proof in this case obliged him to establish that, among other elements, "he was qualified for the position."   (*Risk I*, *supra* p. 6.) Plaintiff confirmed in his *in limine* motion to preclude evidence of his decertification and to bifurcate the trial that his "qualifications for certification are highly contested."   (Plaintiff's motion in limine, p. 4, ¶ 22.)   Thus, it was beyond dispute that plaintiff had to establish that he was qualified to be considered and paid as a municipal police officer, "and [he] must do so by evidence sufficient to convince a reasonable juror to find for him on the issue.   If [he] cannot prove this fact, [he] cannot make out a prima facie case, and the burden never shifts to the defendant."   *Equal Employment Opportunity Commission v. Fargo Assembly Co.*, 142 F. Supp. 2d 1160, 1163-1164 (D. N. Dak. 2000).

"Of course, while plaintiff bears the burden of proving qualification, defendant is free to present evidence showing lack thereof."   *EEOC*, *supra*, 142 F. Supp. 2d at 1164.

The Commission's revocation of plaintiff's police officer certification and documents related to that decision go directly to the heart of plaintiff's qualification as a police officer.

28

Plaintiff must have a valid certification before he can be considered as a qualified police officer. Absent a valid certification, plaintiff has no right to act as a police officer, he cannot be paid or compensated as a police officer, and no municipality can employ him as a police officer.[3] Moreover, as established above, the revocation of plaintiff's certification effected a complete nullification of the certification and returned plaintiff to his non-certified status. Furthermore, as also established above, plaintiff is bound and estopped by, and cannot challenge in this Court, the Commission's decision and the findings and conclusions that it approved and adopted.

The Commission's decision to revoke plaintiffs certification as a police officer nullified his certification and returned plaintiff to his prior non-certified status. Thus, the revocation not only had the instant impact of ending plaintiff's certification, it also had the retroactive effect of returning plaintiff to the same position he occupied had the certification never been issued. Moreover, the revocation had the retroactive and prospective effects of voiding and annulling any of plaintiff's property or employment rights or interests stemming from that certification. *Keeley v. State Real Estate Commission*, 93 Pa. Cmwlth. 291, 296-297, 501 A.2d 1155, 1158 (1985) (quoting Black's Law Dictionary 1188 (5th Ed.1979)); *Pittenger v. Department of State, Bureau of Professional & Occupational Affairs*, 142 Pa. Cmwlth. 57, 62, 596 A.2d 1227, 1230 (1991).

While *McKennon*, *supra*, and *Mardell v. Harleysville Life Insurance Co.*, 65 F.3d 1072 (3d Cir. 1995), prohibit the use of plaintiff's decertification as a reason or justification for his

---

[3] "It is unlawful for a municipal police department to hire a non-certified individual as a police officer. 53 Pa. C.S. § 2167." *Salters*, *supra*, 912 A.2d n.2 at 349. Furthermore, in its "INELIGIBILITY FOR COMPENSATION" subsection, the law declares, "**Any person hired as a police officer shall be ineligible to receive any salary, compensation or other consideration for the performance of duties as a police officer unless the person has met all of the requirements as established by the commission and has been duly certified as having met those requirements by the commission.**" 53 Pa. C.S. § 2167(b) (emphasis added)

termination by defendant, defendant did not and does not seek to use the revocation of plaintiff's certification for that purpose  Instead, defendant raised and now reasserts the Commission's revocation of plaintiff's police officer certification and related facts and documents on a different issue, the element of plaintiff's prima facie case that "he was qualified for the position."  Neither *McKennon* nor *Mardell* prohibit that application of the Commission's revocation of plaintiff's certification.

"Crucial to this issue is that the evidence in *McKennon* was offered for a different purpose than that for which defendant offers the evidence here.  In *McKennon*, the defendant conceded its discrimination against the plaintiff and offered the after-acquired evidence of plaintiff's wrongdoing as a legitimate reason for discharging her.  Here, however, defendant has not in any way conceded liability.  Rather, it seeks to use the evidence to undercut the plaintiff's proof that [he] was qualified for the job.  Further, the evidence concerns not an unrelated wrongdoing, as in *McKennon*, but an aspect of [plaintiff's] prima facie case:  His ability to perform the job.  In short, defendant seeks to use this evidence, presumably along with other evidence, to prevent plaintiff from shifting the burden.  It is not using it to justify an otherwise discriminatory decision.  To this extent, the evidence is admissible." *EEOC*, *supra*, 142 F. Supp. 2d at 1164.

The *EEOC* court's holding that "the subsequently obtained evidence may be used to establish liability, at least to the extent it bears on proving or disproving plaintiff's prima facie case," *EEOC*, *supra*, 142 F. Supp. 2d at 1165, and defendant's motion for judgment as a matter of law on the ground that plaintiff was not qualified for the position of police officer find additional support in the Fifth Circuit's decision in *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558 (5th Cir. 1998).

*McConathy* also involved the use of "after acquired evidence" on the question of the plaintiff's qualification to bring suit.  The plaintiff in *McConathy* raised *McKennon* to block the estoppel use of her Social Security disability application on the issue of her qualification to sue.  The Court of Appeals rejected plaintiff's argument and held that *McKennon* did not foreclose the use of plaintiff's disability application.  "The situation is different here. According to McConathy, *McKennon* indicates that after-acquired evidence cannot be used to estop McConathy from arguing that an adverse employment decision was made because of her disability.  However, **her statements are being used in this case in relation to her job qualifications, a matter which has nothing to do with the motivation behind her employer's action.  *McKennon* involves the use of after-acquired evidence for a different reason than here, and is therefore not on point.**  *McConathy*, 131 F.3d at 563 (emphasis added).

The Third Circuit's decision in *McNemar v. Disney Store*, 91 F.3d 610 (3d Cir. 1996), further reinforces defendant's position that *McKennon* does not preclude the use of plaintiff's decertification in determining that he was not qualified for the position of police officer.  In *McNemar*, as in *McConathy* and in this case, "after acquired" evidence that plaintiff was estopped from contesting was used to establish that the plaintiff was not qualified.  As the Third Circuit recited in *McNemar*, "[t]he EEOC argues also that McNemar's sworn declaration of total disability is 'after-acquired evidence' that has no bearing on the prima facie issue of McNemar's status as a qualified individual with a disability.  Yet the threshold question in this case, fully examined by the district court, is precisely whether McNemar is covered by the ADA for purposes of his prima facie case." *McNemar*, 91 F.3d at 620-621.

The Court of Appeals rejected the EEOC's argument that McKennon precluded the use of the evidence to determine that the plaintiff could not establish a prima facie case:

31

Nevertheless, **the EEOC wants to mix apples -- a plaintiff's prima facie case -- with oranges -- a defendant's non-discriminatory-reason**. It seeks to analogize this case to the teachings of *McKennon v. Nashville Banner Pub. Co.*, 130 L. Ed. 2d 852,    U.S.    , 115 S. Ct. 879 (1995), which address the doctrine of "after-acquired evidence" and establish it as an affirmative defense that becomes meaningful once the plaintiff has established a prima facie case of discrimination. At that point, the employer is required to articulate its non-discriminatory reason and then may assert its additional defenses, such as after-acquired evidence, which may limit damages.

**We emphasize again that the relevant question in this case is whether McNemar established a prima facie case of discrimination**, and because he has not, Disney has no obligation even to articulate a legitimate business reason for its decision. Seen in this light, **the EEOC's assertion that "[a] plaintiff's claim cannot be defeated by an issue of qualifications that has nothing to do with the employer's motivation for the adverse action" becomes irrelevant, again because that assertion has to do with Disney's putative pretext for firing McNemar, which is not a proper concern for the court unless McNemar first has established a prima facie case that he was qualified for the job. This he failed to do.**

*McNemar*, 91 F.3d at 621 (citations and footnotes omitted; emphasis added).

Neither *McKennon* nor *Mardell* prohibit the application of the Commission's revocation of plaintiff's certification to the threshold question of plaintiff's qualification. Because the Commission's decision established that plaintiff was not qualified as a police officer as a matter of Pennsylvania law, and because he was estopped from contesting that point, he was not qualified to pursue this action. Judgment should now be entered in favor of defendant and against plaintiff, and the Court's award of attorneys fees and costs to plaintiff should be vacated.

## 2.   PLAINTIFF SHOULD NOT HAVE BEEN AWARDED BACK PAY

In addition to denying plaintiff's claims for front pay and reinstatement, which were clearly prohibited under *McKennon*, the Court should have denied plaintiff's claim for back pay in its entirety, and it should now enter judgment as a matter of law in defendant's favor on that claim.

32

In *McKennon*, the Supreme Court recognized that "[t]he proper boundaries of remedial relief in the general class of cases where, after termination, it is discovered that the employee has engaged in wrongdoing must be addressed by the judicial system in the ordinary course of further decisions, for the factual permutations and the equitable considerations they raise will vary from case to case." *McKennon*, *supra*, 513 U.S. at 361-362.  Thus, while the Court rejected an "absolute rule barring any recovery of backpay," it did not completely prohibit courts from eliminating back pay awards on a case-by-case basis.  On that point, the Court stated, "In determining the appropriate order for relief, the court can consider taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party."  *Id.* at 362.  See also, *Mardell*, *supra*, 65 F.3d at 1074 n. 4 ("We make no effort at this juncture to adumbrate the contours of the "extraordinary equitable circumstances" doctrine, *see McKennon*, 115 S. Ct. at 886.  The district court will have to explore that subject, if presented by an appropriate record, on remand.")[4]

The revocation of plaintiff's certification on the grounds found by the Commission through its hearing officer indisputably constitute such "extraordinary equitable circumstances." The Court should consider "extraordinary equitable circumstances" and eliminate the award of back pay to plaintiff.

The Supreme Court recognized, even before the immigration law made it illegal and punishable for an employer to hire or employ an illegal alien, that it would be inappropriate for the National Labor Relations Board ("NLRB") to provide back pay to illegal immigrants as part

---

[4]        In footnote 1 at page 4 of his motion *in limine* to exclude evidence of his decertification and to bifurcate the trial of this case, plaintiff also recognized the flexibility that *McKennon* explicitly provided in the fashioning of the appropriate order for relief, taking into further account extraordinary equitable circumstances that affect the legitimate interests of either party.

of its remedy for violations of the National Labor Relations Act ("NLRA"), even though the NLRA was held to cover illegal aliens. *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 902-903 (U.S. 1984). The Court reasoned, "the implementation of the Board's traditional remedies at the compliance  proceedings must be conditioned upon the employees' legal readmittance to the United States.  In devising remedies for unfair labor practices, the Board is obliged to take into account another 'equally important Congressional [objective],' -- to wit, the objective of deterring unauthorized immigration that is embodied in the INA.  By conditioning the offers of reinstatement on the employees' legal reentry, a potential conflict with the INA is thus avoided. Similarly, in computing backpay, the employees must be deemed 'unavailable' for work (and the accrual of backpay therefore tolled) during any period when they were not lawfully entitled to be present and employed in the United States." *Id.*

Later, in *Hoffman Plastic Compounds, Inc. v. National Labor Relations Board*, 535 U.S. 137 (2002), decided after the immigration law made it illegal and punishable for an employer to hire or employ an illegal alien, the plaintiffs sought back pay for the hours that they would have worked had they not been terminated for engaging in protected, union-related activities. However, the Supreme Court foreclosed the NLRB from awarding back pay to an undocumented alien who had never been legally authorized to work in the United States but who still resided in the United States, because " allowing the Board to award backpay to illegal aliens would unduly trench upon explicit statutory prohibitions critical to federal immigration policy, as expressed in IRCA. It would encourage the successful evasion of apprehension by immigration authorities, condone prior violations of the immigration laws, and encourage future violations. However broad the Board's discretion to fashion remedies when dealing only with the NLRA, it is not so unbounded as to authorize this sort of an award." *Id.* at 151-152.

34

In reaching that conclusion, the Supreme Court also rejected the Board's arguments, which, like plaintiff's "after discovered evidence" arguments in this case, sought to allow back pay up to the time when the employer learned of the employee's illegal status. Rejecting that contention, the Court declared, "There is no reason to think that Congress nonetheless intended to permit backpay where but for an employer's unfair labor practices, an alien-employee would have remained in the United States illegally, and continued to work illegally, all the while successfully evading apprehension by immigration authorities. Far from 'accommodating'" IRCA, the Board's position, recognizing employer misconduct but discounting the misconduct of illegal alien employees, subverts it." *Id.* at 149-150 (footnote omitted).

Extending remedial rulings under the NLRA to remedial issues under Title VII or the coordinate PHRA finds support in the similarity of the remedial language of the two statutes. Section 10(c) of the NLRA authorizes the NLRB to remedy the effects of unfair labor practices by ordering violators "to take such affirmative action, including … backpay, as will effectuate the policies of the Act. . . ." (29 U.S.C. § 160(c).) Similarly, Title VII provides that "the court may … order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay …, or any other equitable relief as the court deems appropriate." (42 U.S.C. § 2000e-5(g).)

Additionally, there are legislative policies and prohibitions involved in this case that parallel the legislative policies and prohibitions that led the Supreme Court to curtail back pay awards in *Sure-Tan* and in *Hoffman*.

First, as established above, the Commission's revocation of plaintiff's certification not only had the instant impact of ending plaintiff's certification, it also had the immediate retroactive effect of returning plaintiff to the same position he occupied had the certification

never been issued.  Moreover, the revocation had the retroactive and prospective effects of voiding and annulling any of plaintiff's property or employment rights or interests stemming from that certification.

Second, under Pennsylvania law, "[i]t is unlawful for a municipal police department to hire a non-certified individual as a police officer.  53 Pa. C.S. § 2167."  *Salters*, *supra*, 912 A.2d at 349 n. 2.

Third, the statute under which plaintiff's certification was granted and revoked prohibits anyone from being compensated as a municipal police officer who, like plaintiff, does not hold a valid certification.  53 Pa. C.S. § 2167(b).

Given those points, it would be inequitable and improper to compel defendant to pay any back pay to plaintiff.  That would be contrary to unambiguous Pennsylvania law.  Conversely, awarding back pay to plaintiff despite the improprieties found in his securing his position with defendant would provide him with a reward for his wrongdoing and allow him to obtain back pay for work he never performed, to which he had no right in the first place, and to which he certainly now has no legitimate claim.  There is no equitable reason that favors plaintiff and overpowers those considerations.

Accordingly, plaintiff's back pay award and interest should be stricken and judgment entered for defendant on plaintiff's back pay claim.

### 3.     THE EVIDENCE IS LEGALLY INSUFFICIENT TO SUPPORT THE JURY'S VERDICT

Plaintiff presented no direct evidence that Borough Council was motivated by religious discrimination against plaintiff when it decided in March of 2005 to take the final step to implement the budget savings plan, proposed in September of 2004 after a study by Council

36

President, to restructure the defendant's police force by terminating the services of five part-time police officers, including plaintiff, in lieu of the full-time officer that was hired in January of 2005 as part of that cost-saving plan.  The lack of direct evidence that defendant's decision was motivated by religious discrimination against plaintiff triggered at trial the burden shifting of *McDonnell Douglas Co. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and at this post-trial stage of the case, focuses the analysis on whether plaintiff's evidence was legally sufficient to prove circumstantially that defendant's non-discriminatory reason for its decision was pretextual.

Although plaintiff need not provide affirmative evidence of discrimination in addition to proof of pretext under *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), the Third Circuit's standard for proving pretext under *Fuentes v. Perskie*, 32 F.3d 759 (3d Cir. 1994), which "**places a difficult burden on the plaintiff**," still prevails.  *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3rd Cir. 2005) (emphasis added).  *Fuentes* requires a plaintiff to put forward "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."  *Fuentes*, 32 F.3d at 765. (internal quotation and citation omitted; emphasis in the original); *Kautz*, 412 F.3d at 467.

Under *Fuentes*, a plaintiff's evidence rebutting the employer's proffered legitimate reason or reasons must allow a factfinder reasonably to infer that the reason or each of the reasons "was either a post hoc fabrication or otherwise did not actually motivate the employment action."  *Fuentes*, 32 F.3d at 764; *Kautz*, 412 F.3d at 467.  In a footnote, *Fuentes* allowed for the possibility that in a case where a "defendant proffers a bagful of legitimate reasons," casting "substantial doubt on a fair number of them . . . may impede the employer's credibility seriously

enough so that a factfinder may rationally disbelieve the remaining proffered reasons." *Fuentes*, 32 F.3d at 764 n. 7; *Kautz*, 412 F.3d at 467.

But this is not a case in which the employer proffered a bagful of legitimate reasons for its decision.  There was only one:  defendant sought to save money (a reason that plaintiff told the jury was legitimate and not in dispute (N.T. 3/27/08, p. 45, 46)); a fiscal study revealed that relatively significant savings could be gained if five of the defendant's eight part-time police officers would be replaced by a full-time officer (something plaintiff did not contest); and an analysis of the number of times that the eight part-time officers had been scheduled for duty between September of 2004 and March of 2005 (the only such records available to defendant due to a flood that plaintiff's attorney noted to the jury was memorable (N.T. 3/27/08, p. 54-55)) showed that plaintiff did not place among the top three scheduled officers.[5]

This is, however, a case in which plaintiff proffered a bagful of contentions why defendant's reason was pretextual.  But, "Fuentes instructs that pretext is not shown by evidence that 'the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'"  *Kautz*, 412 F.3d at 467 (citing *Fuentes*, 32 F.3d at 765).  Instead, plaintiffs must "present evidence **contradicting the core facts put forward by the employer as the legitimate reason for its decision**."  *Id.* (emphasis added).

---

[5]     Plaintiff may have kept personal copies of a full year's worth of the defendant's police schedules, and he may have shown that the full year's records may have changed the picture of his work record and availability, but he never proved that defendant actually had access to those records, and he never refuted, cast any doubt, or gave the jury any factual reason to disbelieve that the defendant did not have the full year records but only records from September onward because of the flood.

In addition, while "[a]n employer may not use evaluating criteria which lacks **any relationship at all** to the performance of the employee being evaluated because to do so would be inconsistent with and contradictory to the employer's stated purpose, in the absence of "this type of violation of the *Fuentes* standard, [the Court of Appeals] **will not second guess the method an employer uses to evaluate its employees**." *Kautz*, 412 F.3d at 468 (emphasis added). In review, the court must look carefully at each side's points. *Id.*

The "core facts" recited above that comprised defendant's legitimate, non-discriminatory reason to terminate the service of plaintiff and four other part-time officers were not seriously disputed at trial. Plaintiff did, however, produce considerable improperly admitted evidence, and his case was unquestionably and overwhelmingly promoted by several erroneous and prejudicial jury instructions. Without those elements, plaintiff's attacks would have failed as a legitimate basis for the jury to find pretext.

But, even considering the mistakenly admitted evidence, plaintiff's attacks against the core facts of defendant's legitimate basis for its decision did not establish that defendant's evaluating criteria lacked any relationship at all to the performance of the employees being evaluated. Instead, plaintiff's attacks amount in retrospect and close analysis to nothing more than attacks on non-core facts or attacks to convince the jury that defendant's decision was wrong, mistaken, unwise, imprudent, or incompetent. Those attacks did not constitute "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence" or that the defendant's non-discriminatory reason was "either a post hoc fabrication or otherwise did not actually motivate the employment action."

39

Nor, on the other side of the coin, did those attacks provide a legitimate basis for the jury to find that the defendant's decision was motivated by religiously discriminatory animus directed against plaintiff.

What Chief Roberts may have opined to Ms. Provost may have turned out in part to be true, as far as which of three officers might be retained.  But, that personal opinion could not have influenced Borough Council, because there is no evidence that Chief Roberts told anyone on Council to fire plaintiff, let alone that plaintiff's employment should be terminated because he was a religious man.

Chief Roberts' telling plaintiff to remove the cross pin amounted simply to something that the Chief could legitimately do.  It was only through legally misguided argument and instruction that the jury could turn that against defendant.  Likewise, even if Chief Roberts did not like plaintiff's taking the issue to the Mayor and to Council, that reaction hardly indicates religious discrimination or an inclination to seek revenge by making sure that, although the Chief had been self-recused from the decision process, the Borough Council would understand that plaintiff had to be fired because he wanted to go to church.

The fact that plaintiff's scheduling dropped by 59% after his attorney's letter was sent while other officers' scheduling went up (N.T. 3/27/08, p. 52) does not validate the jury's verdict. Those numbers ignore the facts that Chief Roberts was largely not involved in the scheduling process and that other officers were scheduled less than plaintiff.

That some or even all members of Council thought that Chief Roberts was involved in selecting the officers to be retained may have been mistaken, but it does not displace any of the core facts behind defendant's non-discriminatory reason or prove a decisional motivation that was discriminatory against plaintiff.

Whether the ultimate criterion was scheduling and not-on-the-job performance does not carry the day for plaintiff.  There was no evidence that plaintiff's job performance was better than any other officer.  Likewise, that notes of availability or other items in the officers' personnel files or duty logs were not considered is also irrelevant.  The employer's choice of criterion in this case was not biased and cannot be second-guessed, because scheduling was in fact related in some fashion to performance.  That there may have been other gauges does not matter, nor does the existence of other yardsticks render the one used by defendant implausible, inconsistent, incoherent or contradictory.  See, *Fuentes*, *supra*, 32 F.3d at 765; *Kautz*, *supra*, 412 F.3d at 471.  "This argument fails because it is axiomatic that the mere fact that a different, perhaps better, method of evaluation could have been used is not evidence of pretext unless the method that was used is so deficient as to transgress the *Fuentes* standard." *Kautz*, 412 F.3d at 471.  Defendant's method was not so deficient.  "Evidence that the method of evaluation an employer used was not the best method does not amount to evidence that the method was so implausible, inconsistent, incoherent or contradictory that it must be a pretext for something else." *Id.*

Even if Chief Roberts or Mr. Johnson or both believed mistakenly that plaintiff was not available for work on Sunday because he wanted to go to church, that also would not prove that the defendant's decision was based on religious discrimination.  "This argument is riddled with assumptions and lacking evidentiary support in the record." *Kautz*, *supra*, 412 F.3d at 471.

First, there was no evidence that either Chief Roberts or Mr. Johnson communicated that belief to anyone on Borough Council as a reason not to retain plaintiff.  Even plaintiff's attorney conceded that neither Ms. Church nor Chief Roberts knew "what was on Johnson's mind."  (N.T. 3/26/08, p. 136.)

41

Second, there is no evidence and really no reason to believe that anyone on Borough Council rested his or her vote on the mistaken belief that plaintiff did not want to work on Sundays because he wanted to go to church, particularly since the potentially conflicting Saturday night into Sunday morning shift had been eliminated about six months before the March 2005 decision.

Third, plaintiff's theme that he was fired for wanting to worship and for not wanting to work a shift that no longer existed actually backfires and refutes his religious discrimination claim on close analysis.  Once the Saturday night into Sunday morning shift was eliminated at the end of October of 2004, there was no conflict between plaintiff's voluntary church attendance (there was no evidence that church attendance on Sunday or any other day was a requirement of plaintiff's religion) and any work shift on the police force.  Thus, there was no need for the continuation of plaintiff's moot request that he not be scheduled for the non-existent shift and obviously no reason to accommodate that request.  Furthermore, while plaintiff contended that firing him because he preferred to go to church was evidenced by the abolition of the previously conflicting work shift and plaintiff's articulated desire not to be assigned that shift, that contention amounts to nothing more than a crafty legal slight of hand.  Firing plaintiff for not wanting to work a shift that no longer existed as indicative of religious discrimination may sound impressive to a lay juror when moralized by a skilled attorney, but it just does not make sense in a sound legal analysis.

Although "it is "an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees," *TWA v. Hardison*, 432 U.S. 63, 74 (U.S. 1977), it is also true that Title VII does not provide plaintiff with an entitlement to preferential treatment due to his

religiosity.  *Id.* at 81 ("Title VII does not contemplate such unequal treatment. The repeated, unequivocal emphasis of both the language and the legislative history of Title VII is on eliminating discrimination in employment, and such discrimination is proscribed when it is directed against majorities as well as minorities.")  That is the essence of plaintiff's case:  I am a religious person, so you must retain me regardless of others, because if you do not, you are discriminating against me due to my religiosity.  That circular reasoning, even when surrounded by the evidence advanced by plaintiff and topped by the jury's verdict, does not prove pretext or religious discrimination.

Finally, "[i]t is true that **in extreme enough cases**, an employer's inconsistencies in its proffered reasons for discharge can constitute evidence of pretext.  See *Abramson v. William Paterson Coll. of N. J.*, 260 F.3d 265, 284 (3rd Cir. 2001) (employer offered new and unrelated reasons for termination at latter stages of litigation); *Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 281 (3rd Cir. 1998) (employer gave entirely unrelated rationales for termination to EEOC and trial court); *EEOC v. L.B. Foster Co.*, 123 F.3d 746, 753 (3rd Cir. 1997) (deposition and trial rationales were unrelated). In all of these cases, pretext was evidenced by the decision-maker's having totally different and unrelated rationales for the employment decision at different stages of the litigation." *Hoechstetter v. City of Pittsburgh*, 79 Fed. Appx. 537, 539-540 (3rd Cir. 2003) (footnote omitted; emphasis added).  "Here, however, no such dramatic shift of reasons took place." *Id.*

With or without the tainted evidence, plaintiff's case failed to provide a legally sufficient basis for the jury's verdict.  Accordingly, judgment should be entered in favor of defendant and the Court's award of attorneys fees and costs to plaintiff should be vacated.

## C.   ALTERNATIVELY, DEFENDANT IS ENTITLED TO A NEW TRIAL

### 1.   THE COURT SHOULD NOT HAVE INSTRUCTED THE JURY THAT PLAINTIFF WAS QUALIFIED

The Court committed reversible error when it instructed the jury that it could determine whether Plaintiff was qualified as a police officer when he had been duly and properly decertified as a municipal police officer.  (N.T. 3/27/08, p. 83.)  The Court did not list a separate question on that topic on the verdict sheet, as defendant requested, but rather mentioned the element in its charge to the jury, even though the Court found plaintiff to be qualified as a matter of law.  (N.T. 3/27/08, p. 21.)  Nevertheless, the instruction was given, and the jury returned a verdict for plaintiff.  Thus, it naturally follows that the jury found that plaintiff was qualified.

However, as discussed above, plaintiff's decertification was retroactive and rendered him unqualified as a matter of law.  Consequently, the Court's instruction to the jury was legally mistaken and the resulting verdict was improperly tainted by that error.  Accordingly, the Court should vacate its judgment and order a new trial.  Of course, the Court's award of attorneys fees and costs to plaintiff should also be vacated.

### 2.   THE POLICE TENURE ACT AND THE CROSS PIN INSTRUCTIONS WERE PREJUDICIALLY ERRONEOUS

Although a "District Court does not abuse its discretion by refusing to emphasize legal inferences favoring one side," because "[e]mphasizing arguable inferences to jurors is the job of advocates, not courts, and there is no abuse of discretion when the court's instructions to the jury fairly and adequately cover the issues presented, and provide the complaining party with ample room to argue its theory of the case to the jury, *Grazier v. City of Phila.*, 328 F.3d 120, 127 (3d Cir. 2003), the court's instructions in this case were not fair, because they emphasized legal

44

inferences that favored plaintiff, and foreclosed defendant from adequately arguing its case to the jury.

As to the Police Tenure Act, the court's instruction sided squarely with plaintiff and foreclosed any effective argument regarding the inapplicability of the Act.  On that point, the Court explicitly told the jury that, despite what it may have heard from or on behalf of defendant, the Act applied.  (N.T. 3/27/08, p. 85-86.)  That part of the instruction was legally incorrect.  Furthermore, the court told the jury that it could find pretext, not only on plaintiff's Title VII claim but also on his PHRA claim, if defendant violated the Act's seniority protocol.  (*Id.*, p. 86, 89.)  That part of the instruction was also legally incorrect.

Because the court told the jury that the Act applied and that the jury could find pretext from a failure to follow the Act's seniority protocol, defendant could not effectively argue that the Act did not apply or that the jury could not make the finding that the court said it could make.  Ultimately, because there was no dispute that the seniority protocol was not followed, the effect of the instruction was to draw for the jury, as plaintiff urged in his closing arguments about defendant's failure to play by the seniority rules (N.T. 3/27/08, p. 71), the legal and factual inference that defendant's explanation for discontinuing plaintiff's employment and its explanation that religion was not a factor in that decision were pretextual.  That was tantamount to directing a verdict for plaintiff, both on his religious discrimination claim, and, because the Court's instructions told the jury to apply its pretext charge to plaintiff's retaliation claim, to that claim as well.

As to the cross pin instruction, what the Court told the jury prevented defendant from effectively arguing that Chief Robert's telling plaintiff twice to remove the cross pin was not evidence of religious discrimination against plaintiff by defendant.  By telling the jury that it

45

could find religious discrimination in the requests to remove the cross pin, even though plaintiff had no right to wear the pin and even though those requests did not violate plaintiff's First Amendment rights (which include both political and religious aspects), the Court again foreclosed defendant from successfully arguing otherwise.

Moreover, the *court's* instruction told the jury what legal and factual inference to draw from the cross pin removal requests.  Because there was no dispute that those requests were made, the  instruction again amounted to a directed verdict for plaintiff.

Because the Court's instructions were legally incorrect, the Court must grant a new trial unless the erroneous instructions were merely harmless error.  As stated above, harmless error can only be found when there is a high probability that the error did not substantially affect defendant's rights or affect the outcome of the case.  That standard cannot be met in this case, because the prejudice to defendant from the Court's instructions is undeniable:  both instructions decided critical issues for the jury and were the equivalent of directed verdict rulings for plaintiff on his religious discrimination claim.  Moreover, the Tenure Act pretext charge delivered the equivalent of a directed verdict on plaintiff's retaliation claim as well.

Conversely, it cannot be said to a high degree of probability that the jury's verdict would have been the same even if the correct instructions were given.  Both the seniority protocol under the Tenure Act and the cross pin incident and their respective instructions played a major role in plaintiff's case.  If they were removed, plaintiff would not have been favored by the strong tilt placed on the scale against defendant by the instructions and their related evidence.

On the Tenure Act, defendant would have been free to argue correctly and successfully that plaintiff had no seniority rights.  The defense would not have been harmed by plaintiff's surprise injection of that issue, which had never been raised by plaintiff's complaint or by his

pretrial memorandum as a matter to be raised by him at trial. Moreover, defendant could argue its case and its non-discriminatory and non-retaliatory bases for its decisions and actions without having everything said about them rejected as pretext simply because plaintiff was not given seniority rights to which he was not entitled.

As to the cross pin issue, plaintiff likely would not have presented evidence on that topic, or if he did so proceed, defendant would have been entitled to a straight forward jury instruction that it was proper to have plaintiff remove that pin without the contradictory addition delivered at trial that the requests could be construed as religious discrimination.

The outcome of the case would most probably have been different. The evidence showed that the decision to cease employing plaintiff was made by Borough Council and that it was founded on the recommendation of a member of council who voiced only a non-discriminatory basis for his recommendation. Plaintiff's inquiries into the fullness or the accuracy of that basis provided nothing but red herring points, since none of those points undermined the core facts of defendant's decision or indicated a motive to discriminate against plaintiff because of his religiosity.

The Court's instructions to the jury on the Police Tenure Act and on the plaintiff's cross pin were predicated on erroneous legal principles and unquestionably caused prejudice to defendant. Accordingly, the Court should vacate its judgment and its award of attorneys fees and costs to plaintiff, and order a new trial.

### 3.      AMY PREVOST'S STATEMENT AND TESTIMONY

Chief Roberts' expression of his predictive opinion in the guessing game during an informal, off-duty chat with Amy Prevost while he was buying his dinner in November of 2004 could not have possibly influenced the decision made months later in March of 2005 by Borough

Council members who were not involved in that conversation.  Although the members of Borough Council became aware of that conversation and Chief Robert's predictions when plaintiff's attorney published Ms. Prevost's statement as an enclosure to his letter in December of 2004, neither the statement nor the attorney's cover letter conveyed the Chief's remarks in an endorsing way.  Their position was quite to the contrary.  If anything, the statement and letter would have encouraged Borough Council to act properly.

Even if, as plaintiff argued in his closing address, one might extrapolate from Mr. Miller's comments on the statement and the letter that each and every member of Borough Council disregarded them as "garbage" (N.T. 3/27/08, p. 44, 45, 56, 57, 62), that line of reasoning supports a finding that the statement and letter were unnecessary, but no support for a finding that Borough Council was motivated by religious discrimination against plaintiff to make its decision to achieve budgetary savings by releasing those part-time officers who worked the least number of hours as shown on the available police schedules.

Yet, the admission of Ms. Prevost's testimony led to the admission of her statement, the attorney's letter, and the grilling of witnesses on what Chief Roberts said to Ms. Prevost and what he said about what he said to her.  More significantly, what Chief Roberts predicted was used by plaintiff to convince the jury that, even as early as November of 2004, the decision had in fact been made to fire plaintiff and that decision was carried out unchanged in March of 2004. (N.T. 3/27/08, p. 43-44, 46-47, 50, 51.)

Ms. Prevost's statement and testimony contained inadmissible hearsay and should never have been admitted.  It touched on and opened an avalanche on a key issue in plaintiff's case, and undoubtedly influenced the jury to defendant's prejudice.  See, *e.g.*, *Lippay*, *supra*, 996 F.2d at 1500 ("Philbin's alleged statement was the only evidence which showed that Philbin harbored

48

any doubts as to Dick's identity and expressed them to Christos prior to Lippay's arrest. Because Christos' state of mind was the key issue before the jury, we cannot possibly conclude that it is highly probable that this evidence did not affect the verdict.")

Consequently, the Court should vacate its judgment and its award of attorneys fees and costs to plaintiff, and grant a new trial.

### 4. THE INSTRUCTION ON WORKPLACE CULTURE WARRANTS A NEW TRIAL

Although short, the Court's instruction to the jury on "workplace culture" requires a new trial. On that point, the court told the jury, "In determining whether defendant's reason for firing Mr. Risk is a pretext for religious discrimination, you may examine the reasons provided against a backdrop of defendant's workplace culture. Thus, among other things, you may consider evidence of the atmosphere at defendant's workplace and evidence of statements concerning religion, or the need to miss work because of religion." (N.T. 3/2708, p. 84-85.)

In *Dressler v. Busch Entertainment Corp.*, 143 F.3d 778, 782-783 (3d Cir. 1998), the Court of Appeals held that the trial court's use of the single word "any" in part of its "*falsus in uno*" instruction in its charge to the jury required a new trial, because the addition of that word gave the jury the wrong standard on which to evaluate a witness' testimony. Despite the defendant's argument that the instruction was harmless, since it applied to both sides' witnesses, the Court of Appeals rejected that contention, because it had to assume that the instruction was prejudicial to the plaintiff. "When the jury is not informed of the test to apply to testimony, we cannot presume an absence of prejudice." *Id.* at 781 (citing *Connecticut Mutual Life Insurance Co. v. Wyman*, 718 F.2d 63, 64 (3d Cir. 1983)).

49

Again citing *Connecticut Mutual*, the Court of Appeals also rejected the contention that the charge as a whole was fair and that the jury drew its guidance from those portions of the court's charge that were proper.   "Although the court's instructions are fairly exhaustive and largely correct, we cannot cast a blind eye on the court's clear misstatement regarding willful exaggeration.  More importantly, we cannot expect the jury to do so.  We cannot assume that the jury will have the wherewithal to heed that part of the instruction that is accurate and disregard that which is not.  Rather, we must assume that if the jurors are provided instructions that are partly flawed they may well choose the flawed part to inform their duties as finders of fact."  *Id.* at 783.  Moreover, in this case, the Court provided its instructions to the jury both orally and in writing.  (N.T. 3/27/08, p. 74.)

The Court's "workplace culture" charge was legally mistaken and just as prejudicial to defendant in this case as was the trial court's instruction vis-à-vis the plaintiff in *Dressler*.  The instruction in this case had no factual foundation.  As noted above, even if that "culture" included the single remarks attributed to Chief Roberts and to Lt. Murray by Amy Prevost in her store, when plaintiff was not there, those remarks hardly constituted an anti-religious workplace culture.  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.  *Harris v. Forklift Sys.*, 510 U.S. 17, 21-22 (1993).

But, the danger and the prejudice to defendant created by the Court's instruction went beyond those remarks.  In fact, the instructions allowed the jury to find a "workplace culture" in

50

anything that it wanted to, even if that "culture" had nothing to do with plaintiff's actual workplace, or with religion or, more importantly, with religious discrimination as motivating Borough Council's objectively non-discriminatory decision.   Those targets could range from Chief Roberts' preference for TV dinners, through whatever the jury believed was wanting in the operations of the Police Department or of Borough Council, to the "garbage" remark that plaintiff's attorney featured prominently in his closing speech.   (N.T. 3/27/08, p. 44, 45, 49, 53, 56, 57, 62, 73.)

Additionally, the instruction told the jury that it could consider "evidence of statements concerning religion, or the need to miss work because of religion."   Those words would allow the jury to consider any words about religion and any words about the need to miss work because of religion, including plaintiff's own words.

Although short, the Court's instruction allowed the jury an immensely wide sweep of possible considerations about defendant's workplace culture or statements concerning religion or the need to miss work because of religion all of which could be used, individually, together, or in some combination to determine that the defendant's reason for firing plaintiff was completely pretextual, and that defendant fired him because of an anti-religion motivation.   That instruction amounted to a directed verdict, since the crux of the case given to the jury rested on its determination that defendant's decision was motivated not by any reason it articulated, but by religious discrimination.

Because the instruction was wrong and clearly prejudicial, the Court should vacate its judgment and its award of attorneys fees and costs to plaintiff order a new trial.

**5.    ALLOWING THE BELATED INTRODUCTION OF THE DAN JOHNSON DEPOSITION AND THE AUDIOTAPE ADVERSE INFERENCE CHARGE ALSO WARRANT A NEW TRIAL**

As discussed above, the Court should not have allowed plaintiff to belatedly introduce the deposition of Dan Johnson, and the Court should not have given the adverse inference charge. Both actions were erroneous applications of the Court's discretion and they prejudiced defendant.

Dan Johnson's deposition testimony was presented more than once to the jury, and it was the last testimony that the jury heard.  The other advantages that the plaintiff gained by reintroducing that testimony after the defendant rested and when defendant was faced with compelling the ailing Mr. Johnson to return to the courtroom for surrebuttal have been noted above in this brief.  Plaintiff had no logical explanation why he did not call Mr. Johnson to the witness stand when he was in the courthouse waiting to be called for two days.  The Court's decision gave plaintiff an advantage and disadvantaged defendant.  It was not fair and requires the Court to vacate its judgment and its award of attorneys fees and costs to plaintiff and grant a new trial.

The adverse inference also requires a new trial.  That charge undoubtedly influenced the jury's verdict, because, as noted above, it has to be presumed that the jury followed the Court's instructions, which were given both orally and in writing.  In addition, plaintiff argued the point that the jury would legally be able to draw the evidentiary conclusion that the audiotape of the council meeting would have damaged the defendant's case and shown that its explanation for deciding not to retain plaintiff was pretext.  (N.T. 3/27/08, p.69.)  Through the adverse inference charge the Court provided plaintiff with evidence that had no foundation other than the fact of non-production and the instruction itself, and plaintiff achieved that advantage through the fact of non-production alone, having failed to pursue the issue and find out what was on the tape even

after Ms. Church stated that she believed that it existed.  Plaintiff exhibited no interest in ascertaining what the tape contained.  Instead, he sought, and was given, the better advantage of the adverse inference instruction.  That advantage prejudiced defendant and requires the grant of a new trial.  Of course, the Court should also vacate its judgment and its award of attorneys fees and costs to plaintiff.

## V.    **CONCLUSION**

For the foregoing reasons, judgment should be entered in favor of defendant and against plaintiff, and the Court's award of attorneys fees and costs to plaintiff should be vacated.  In the alternative, the Court's award of pack pay and interest should be vacated and judgment should be entered in favor of defendant on plaintiff's back pay claim.

In the event that judgment is not entered in favor of defendant and against plaintiff, the Court should award a new trial and vacate its award of attorneys fees and costs to plaintiff.

Respectfully submitted,

**MARSHALL, DENNEHEY, WARNER,
COLEMAN & GOGGIN**


BY:    _s/ Teresa O. Sirianni_____
TERESA O. SIRIANNI, ESQUIRE
PA ID #90472
**Attorney for Defendant**
600 Grant Steel Street
2900 US Steel Tower
Pittsburgh, PA  15219
(412) 803-1140
(412) 803-1188, fax
tosirianni@mdwcg.com