**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TERRYN RISK,                                            Civil Action No. 05-1068

        Plaintiff,

      vs.                                            Magistrate Judge Lenihan

BURGETTSTOWN BOROUGH,
PENNSYLVANIA,

        Defendant.                                  Jury Trial Demanded

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL

Samuel J. Cordes
Pa. I.D. #54874

Ogg, Cordes, Murphy & Ignelzi
245 Fort Pitt Boulevard
Pittsburgh, PA 15222
(412) 471-8500

Attorney for Plaintiff

# TABLE OF CONTENTS

I.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.      Risk Offered Sufficient Evidence to Support Findings of Discrimination
        and Retaliation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1.      Defendant did not even offer a legitimate non-discriminatory reason
            for its decision to fire Risk. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.      Risk offered substantial evidence that Defendant's reasons were
            pretextual. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            a.      Defendant hid its decision-maker. . . . . . . . . . . . . . . . . . . . . . . 6

            b.      Defendant's reasons were ever-changing.. . . . . . . . . . . . . . . . . 6

            c.      Other circumstantial evidence supports the verdict. . . . . . . . . . . 8

    B.      The Court's Evidentiary Rulings Were Correct. . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        1.      The court correctly took judicial notice of the Pennsylvania Police
            Tenure Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        2.      The Court correctly permitted evidence that Chief Roberts–but not even
            one of its  elected officials–objected to Risk wearing a cross pin for
            the purpose of showing Roberts' anti-religious animus.. . . . . . . . . . . . . 14

            a.      Roberts' objection to the cross pin is evidence of his state of
                mind, especially when every other elected official approved
                Risk's wearing of the cross. . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            b.      Evidence of Roberts' opposition to the Risk's wearing the
                cross pin, also is relevant to Risk's retaliation claim. . . . . . . . . . 16

            c.      The court properly permitted Risk to testify briefly about his
                 decertification. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        3.      Preclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        4.      Risk's qualifications.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

C.     Prevost's Conversation with Chief Roberts............................... 23

    1.     Hearsay............................................................ 24

        a.     Not offered for truth................................... 24

        b.     Party admission..................................... 25

        c.     Notice............................................... 26

    2.     Personal knowledge.......................................... 26

D.     Deposition Testimony of Dan Johnson................................. 27

E.     The Court Properly Instructed the Jury............................... 30

    1.     Police Tenure Act........................................... 30

    2.     Cross pin.................................................. 31

    3.     Decertification............................................ 33

    4.     Adverse inference.......................................... 34

    5.     Workplace culture.......................................... 36

F.     The Court Properly Awarded Backpay................................ 37

G.     Defendant Waived Several Issues by Not Briefing Them.................. 39

IV.   Conclusion............................................................... 40

## I. Introduction

Following a four-day trial, a jury found Defendant Burgettstown Borough unlawfully discriminated and retaliated against Plaintiff Terryn Risk because of his religion in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e-2(a)(1); and 2000e-(3)(a) and the Pennsylvania Human Relations Act, 43 Pa.Cons.Stat.Ann. § 955(a) *et seq.* This Court subsequently awarded Risk backpay, but denied reinstatement and other equitable relief.

Despite substantial evidence that Defendant fired Risk because of his religion and retaliated against him for complaining of religious discrimination, Defendant argues it is entitled to judgment as a matter of law. Likewise, notwithstanding this Court's substantial compromises concerning jury instructions and evidentiary rulings, both before and at trial, Defendant claims it is entitled to a new trial. Defendant also asserts this Court abused its discretion in awarding backpay despite settled law that Title VII plaintiffs are entitled to backpay, even in cases of so-called "after-acquired evidence." *See* McKennon v. Nashville Banner Pub. Co., 513 U.S. 352, 360 (1995); Mardell v. Harleysville Life Ins. Co., 31 F.3d 1221, 1228-30 (3d Cir. 1995)(Mardell I), *vacated on other grounds by* 514 U.S. 1034*, reinstated in relevant part*, 65 F.3d 1072 (3d Cir. 1995)(Mardell II).

Defendant identifies several alleged erroneous evidentiary rulings and jury instructions and claims these errors were not harmless. Defendant is wrong. Risk explains why below.

## II. Statement of Facts

Defendant told Risk he was fired from his job as a police officer on June 23, 2005, although it actually fired him on March 5, 2005. (3/25/08; 159, App. Ex. 1).[1] [2] Risk never had any

---

[1]Defendant initially denied before the Pennsylvania Human Relations Commission that it terminated Risk from employment. (3/25/08, at 39-41, App. Ex. 1); (Trial Exhibit 15, App. Ex. 2); (Trial. Ex. 16, App. Ex. 3) but

(continued...)

1

performance problems and was always available to work when scheduled.  (3/25/08; 95-96, 152, App. Ex. 1); (3/26/08; 66-67, App. Ex. 5). Risk, a Christian and member of the Weirton Covenant Church (3/25/08; 165, App. Ex. 1), told Defendant's Police  Chief George Roberts he preferred not to work the midnight to 8:00 a.m. shift from Saturday night into Sunday morning because he liked to attend Church on Sundays.  (3/25/08; 150-151, App. Ex. 1). However, he also said he would work the shift if needed.  (3/25/08; 151, App. Ex. 1). In fact, Roberts did sometimes schedule him for that shift, and Risk reported to work. (3/25/08; 151, App. Ex. 1). In October 2004, Defendant  eliminated the shift  and there was no longer even arguably a conflict between Risk's religious practices and his work. (3/25/08; 151-152, App. Ex. 1); (3/26/08; 64, App. Ex. 5).

As a sign of his faith, Risk wore a small cross pin on the lapel of his police uniform. (3/25/08; 143, App. Ex. 1). Roberts told him to remove the cross pin, and Risk complied. (3/25/08; 143, App. Ex. 1). With Roberts' permission (3/25/08; 144, App. Ex. 1), Risk then asked several members of Borough Council if they had a problem with his  wearing the pin. All replied they had no problem with it. (3/24/08; 79-80, App. Ex. 6); (3/25/08; 144-146, App. Ex. 1); (3/25/08; 123-124, App. Ex. 1).  Risk again began wearing the pin until Chief Roberts again told him to remove it. (3/25/08; 147, App. Ex. 1).

Defendant sent a letter to all police officers announcing they would be eliminating some positions, and said the decision would be based on performance, including availability.  (Trial Exhibit 3, App. Ex. 7); (3/24/08; 97, App. Ex. 6).  Risk informed Council member and police liaison

---

[1](...continued)
during trial was forced to admit that it wrote risk on June 23 and told him his "employment with the borough has been terminated." (3/25/08 at 41, App. Ex. 1); (Trial Exhibit 4, App. Ex. 4), and that Risk was "terminated." (3/25/08 at 42, App. Ex. 1).

[2]The trial transcript will be referred to by using the date of trial followed by the page number.

Dan Johnson that he was "very available" (3/25/08; 152, App. Ex. 1).  He also wrote Chief Roberts a note that he was available for work every day.  (Trial Exhibit 10, App. Ex. 8).   In addition, he informed Council member Paul Walsh that Chief Roberts was not scheduling him much and asked for more hours.  (3/25/08; 154, App. Ex. 1).

In November 2004, while at a local Unimart after his shift, Chief Roberts asked the clerk, Amy Prevost, who she thought should be retained. (3/24/08; 49, App. Ex. 6). She replied:  Risk, Lt. Joseph Murray, and August Mondin should be kept. (3/24/08; 49, App. Ex. 6). Roberts said she was right on one of the three (3/24/08; 49, App. Ex. 6).  Roberts stated Lt. Murray would stay, but Mondin was not flexible because he had another job, and Risk would be let go because church interfered with his work. (3/25/08; 50, App. Ex. 1).  Prevost told Chief Roberts he should not get rid of a good officer just because he went to Church, and Roberts laughed. (3/25/08; 51, App. Ex. 1). Prevost informed Risk of this conversation. (3/25/08; 154, App. Ex. 1).

Risk believed Roberts' comment about church interfering with his job, along with his repeated requests that he remove his cross pin, were evidence of religious discrimination and that he might lose his job because of his religion. (3/25/08; 155, App. Ex. 1). Therefore, his attorney wrote a letter to Chief Roberts and carbon-copied all members of Borough Council, informing them religious discrimination was against the law and asking them to consider this before firing Risk. (3/25/08; 155, App. Ex. 1); (Trial Exhibit 2, App. Ex. 9).   Attached to the letter was a written statement from Prevost outlining her conversation with Chief Roberts. (Trial Exhibit 2, App. Ex. 9); (3/24/08; 51, App. Ex. 6); (3/25/08, 155-56, App. Ex. 1).

After Risk's attorney wrote this letter, Defendant only scheduled Risk one more time. (3/25/08; 155, App. Ex. 1).  No one from Borough Council spoke to Risk about the letter. (3/25/08;

3

155, App. Ex. 1).  At least one member of Borough Council thought the letter and Prevost's attached statement were "garbage." (3/26/08; 94-95; 100-02, App. Ex. 5).

 In March, Risk learned from reading the newspaper that he was fired.  (3/25/08; 158-59, App. Ex. 1); (Trial Exhibit 18, App. Ex. 10).   However, the decision to eliminate Risk may have happened before February (3/26/08; 74, App. Ex. 5). On June 23, 2005, Defendant officially notified Risk he was fired.  (3/25/08; 159, App. Ex. 1); (Trial Exhibit 4, App. Ex. 4).  Just as Chief Roberts predicted, Risk and August Mondin were fired, while Lt. Murray was retained. (3/24/06; 54; 95, App. Ex. 6)

### III. Argument

### A.   Risk Offered Sufficient Evidence to Support Findings of Discrimination and Retaliation

At the outset, Defendant claims the evidence is insufficient to support the jury verdict in Risk's favor and therefore it is entitled to Judgment as a Matter of Law under Fed.R.Civ.P. 50. (Def.'s Brf. at 28-32). Defendant's Rule 50 Motion is easily disposed of.

A district court may grant a motion for judgment as a matter of law if, and only if, "viewing the evidence in the light most favorable to Risk, and giving him the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury could reasonably find liability. Fed.R.Civ.P. 50(a).  The Court must review all evidence of in the record, "must draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc, 530 U.S. 133, 150 (2000).  *See also* Doe v. C.A.R.S Protection Plus, Inc., 527 F.3d 358, 362  (3d Cir. 2008). The Court must also "disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves,  at 151.

4

Evidence of the non-movant is to be believed, while evidence supporting the moving party is given credence only when uncontradicted, unimpeached and from disinterested witnesses. *Id.*; *Hill v. City of Scranton*, 411 F.3d 118, 129 n. 16 (3d Cir. 2005).

If the record contains even the "minimum quantum of evidence upon which a jury might reasonably afford relief, the verdict must be sustained. Marra v. Philadelphia Hsg Authority, 497 F.3d 286, 300 (3d Cir. 2007); Keith v. Truck Stops Corp. Of America, 909 F.2d 743, 745 (3d Cir. 1990).

> **1.     Defendant did not even offer a legitimate non-discriminatory reason for its decision to fire Risk.**

At the outset, Defendant did not even offer a legitimate, non-discriminatory reason for firing *Risk* as opposed to the other officers.  In a reduction in force case, this means the employer must show why it chose to discharge the *plaintiff*, not just why it chose to discharge employees in general. *See* Tomasso v. Boeing Co., 445 F.3d 702, 707 (3d Cir. 2006).  This Court acknowledged as much after hearing Defendant's Rule 50 argument at the close of Risk's evidence.  (3/25/08; 197, App. Ex. 1).  Even after the Court noted its  "cost-saving" reason was not sufficient, Defendant still never offered evidence of why it fired *Risk.*  Therefore, the burden never shifted back to Risk, and he would have been entitled to judgment as a matter of law. *See* St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 n.3 (1993);  *See also* Hopp v. City of Pittsburgh, 194 F.3d 434 (3d Cir. 1999)(failure to offer reason for decision supported finding of discrimination)

> **2.     Risk offered substantial evidence that Defendant's reasons were pretextual.**

However, assuming Defendant did offer evidence of why it chose Risk to be fired, Risk offered substantial evidence of pretext.

### a.   Defendant hid its decision-maker

First, Defendant hid and changed the identity of the decision-maker throughout the litigation. It first told the Pennsylvania Human Relations Commission Dan Johnson and Mayor McCracken made the decision. (Trial Exhibit 5, App. Ex. 2).  At trial, Defendant identified Borough Council as the decision-maker, though the only two council members who testified at trial claimed to make their decision solely on the recommendation of Mayor McCracken, Chief Roberts, and Dan Johnson. (3/26/08; 98-99, App. Ex. 5); (3/24/08; 104, App. Ex. 6).

The mayor, however, denied taking part in the decision. (3/25/08; 118, App. Ex. 1).  Chief Roberts also denied being a decision-maker (3/26/08; 76-78, App. Ex. 5), but his credibility was in question because he denied to Pam Church having the conversation with Amy Prevost, (3/24/08; 68, App. Ex. 6) but later admitted to the conversation both in his deposition and at trial.  (Roberts Deposition 89-92, App. Ex. 11); (3/26/08; 23-25, App. Ex. 5). Dan Johnson never testified, and therefore never acknowledged or denied making the decision.  The failure of anyone to own up to who made the ultimate discharge decision is itself evidence of pretext. Sabbrese v. Lowe's Home Ctrs., 320 F. Supp. 2d 311, 326 (W.D. Pa.2004)

### b.   Defendant's reasons were ever-changing

Second, contrary to Defendant's assertion, it offered a number of reasons throughout this litigation.  (Def.'s Brf. at 38).  While Defendant argues the only reason it offered at trial was it wanted to save money (a legally insufficient reason for why it fired *Risk*),  it previously offered other discredited explanations for firing Risk.  Defendant initially told the PHRC it fired people according

to performance and availability.  (Trial Exhibit 5, App. Ex. 2)[3]; (3/24/08; 95-99, App. Ex. 6);  (Trial

Exhibit 3, App. Ex. 7).[4]  When Defendant discovered Risk had no problems with performance, it

dropped performance as a reason.  (3/25/08 at 96-97, App. Ex. 1); (Trial Exhibit 6, App. Ex. 12).

Because Defendant has at least three times represented that its decision on who of the

part time officers it would eliminated was based  job performance, [5] Risk can rely on evidence of his

good  performance to rebut Defendant's job performance reasons. The Third Circuit repeatedly has

recognized employees can rely on evidence of good  performance to show pretext in those cases

where employers rely on  performance as a reason for termination.  Tomasso, 455 F.3d at 708-709,

(employee can show pretext by affirmative external evidence of good  performance).[6]

Defendant also answered in its interrogatories that it reviewed Risk's personnel files (Trial

---

[3] After Risk brought a discrimination claim with the Pennsylvania Human Relations Commission, Defendant, under  oath, said: "the Borough Council **based their (sic.) decision** [on who to eliminate] in part *on the part time officers' performance* and availability to work...(Trial Exhibit 5, at page PHRC- 0034, App. Ex. 2); *see also* (3/25/08; 97-98, App. Ex. 1).

[4] Defendant's Police Liaison, and Council member, Dan Johnson told Risk that three police officers would be eliminated in the near future, and that "the determination of who will be removed from the roster **shall be based on past performance**, including, **but not limited to**, availability." (Trial Exhibit 3, App. Ex. 7)(emphasis added).

[5] Indeed, Defendant's current claim that "none of the decision makers considered Plaintiff's job performance when making their decision not to retain the Plaintiff as an employee" (Def's Motion at ¶3 [Doc. No. 71]), itself is admissible to show that Defendant's reasons have changed, giving rise to an inference of pretext. *See* Abramson v. William Patterson College of N.J., 260 F.3d 265, 284 (3d Cir. 2001).

[6] *See also* Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1073-74 (3d Cir. 1996)(en banc)("employee could show pretext in part by adducing affirmative evidence of her own accomplishments including awards, a promotion and a salary increase); Waldron v. SL Indus. Inc., 56 F.3d 491, 496 (3d Cir. 1995)(rebutting poor performance charge with evidence of good performance ); Sempier v. Johnson & Higgins, 45 F.3d 724, 730 (3d Cir. 1995) (rebutting with performance evidence where  performance was reason); Siegel v. Alpha Wire Corp., 894 F.2d 50, 51-52 (3d Cir. 1990)  (rebutting charge of poor performance and disloyalty); Sorba v. Pennsylvania Drilling Co., 821 F.2d 200, 205 (3d Cir. 1987);  (rebutting charge of poor performance); Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 900 (3d Cir. 1987)(*en banc*)(rebutting charge of poor performance); *Cf.*  Hugh v. Butler County Family YMCA, 418 F.3d 265, 269 (3d Cir. 2005)( evidence the employee had never been told about performance when  the employer relied on performance as a reason for discharge creates a jury question  concerning the veracity of the employer's reasons).

Exhibit 7, App. Ex. 13); (3/24/08; 86, App. Ex. 6), but later changed its answer (Trial Exhibit 7-A, App. Ex. 14); (3/24/08; 89, App. Ex. 6), as Risk's personnel file showed he was very available (Trial Exhibit 5-F, App. Ex. 15); (3/24/08; 87, App. Ex. 6).

Dan Johnson testified the reason he fired Risk was because he was unavailable for work because of church. (3/26/08; 147-48, App. Ex. 5). However, the supposed shift Risk preferred not to work had been eliminated long before Defendant fired Risk. (3/25/08; 151-152, App. Ex. 1); (3/25/08 at 120-122, App. Ex. 1).

Though Defendant somehow tries to use this inconsistency in its favor (Def.'s Brf. at 42), **the only undisputed decision-maker in this case identified unavailability during church as the reason it fired Risk.**  This was discredited given the nonexistence of the shift.  This is the type of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" indicative of pretext. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).  Particularly when coupled with other evidence of discriminatory animus, this contradiction shows not that Defendant was "wrong or mistaken," but that discrimination was the real reason for Risk's discharge. Fuentes, 32 F.3d at 765.

### c.      Other circumstantial evidence supports the verdict.

Other circumstantial evidence of discrimination included Chief Roberts' conversation with Prevost (3/24/08; 49, App. Ex. 6)[7]; his insistence that Risk remove the cross pin even after he had permission from Council to wear it (3/25/08; 143-47, App. Ex. 1); scheduling Risk during church hours and then claiming he could not work during church hours (3/25/08; 151, App. Ex. 1); (3/26/08; 148, App. Ex. 5); and Lt. Murray's "Tylenol" comment and Chief Roberts' laughing reaction to it

---

[7]Defendant claims Chief Roberts was not a decision maker, but the jury certainly could believe otherwise. Indeed, Council President Church testified that she consulted with Chief Roberts (3/24/08;  82, 104, App. Ex. 6); and that the Chief was involved in the decision of who to eliminate. (3/24/08; 94, App. Ex. 6).

(3/24/08; 52-53, App. Ex. 6). This attitude toward Risk's religion shows his claim of discrimination was grounded in fact, despite Defendant's argument that Risk was demanding special treatment because of his religion. (Def.'s Brf. at 43). This evidence, along with the inconsistent reasons and uncertain identity of the decision-maker(s), certainly allowed a jury to find discrimination.

With respect to Risk's retaliation claim, the timing between his complaint of discrimination and Defendant's failure to schedule him is unusually suggestive of retaliation, as he stopped being scheduled immediately after Defendant received the letter. (3/25/08; 155, App. Ex. 1). The police officers who were retained, on the other hand, did not complain of discrimination. Council member Andrew Miller referred to Risk's discrimination complaint as "garbage" and "trash" *even if true*, (3/26/08; 94-95, 100-02, App. Ex. 5) and Defendant admitted in closing argument that all the other council members felt the same way. (3/26/08; 31, App. Ex. 5) This indicates Borough Council's passive, if not hostile, attitude toward legitimate complaints of discrimination and makes it more likely for retaliation to occur. *Cf.* Hurley v. Atlantic City Police Dept., 194 F.3d 95. 112 (3d Cir. 1999); Glass v. Phila. Elec. Co., 34 F.3d 188, 195 (3d Cir. 1994)(retaliation more likely when harassment condoned). Given this evidence, along with the evidence of pretext stated above, the jury had plenty of evidence that Defendant retaliated against Risk for complaining of religious discrimination.

### B.      The Court's Evidentiary Rulings Were Correct.

Next, defendant points a plethora of evidentiary rulings and claims it is entitled to a new trial because of those allegedly incorrect rulings. (Def.'s Brf. at 6-27).

Defendant argues this Court erred in admitting evidence concerning the following: (1) the Pennsylvania Police Tenure Act; (2) Risk's cross pin and Chief Roberts' insistence that he remove

it; (3)  Risk's testimony concerning his decertification as a police officer; (4)  Chief Roberts'

conversation with Amy Prevost that Risk would be eliminated because of church attendance; and

(5)  the deposition testimony of Dan Johnson.  However, this Court properly admitted all evidence.

### 1.   The court correctly took judicial notice of the Pennsylvania Police Tenure Act.

Risk asked the Court to take judicial notice of the Pennsylvania Police Tenure Act for the

sole purpose of showing Defendant departed from standard procedures when firing Risk.[8]  An

employer's failure to follow its own policies or laws when taking an adverse employment action is

evidence of pretext.  Village of Arlington Heights v. Metro. Hous. Development Corp., 429 U.S.

252, 267 (1977);  Colgan v. Fisher Scientific, 935 F.3d 1407, 1422-23 (3d Cir. 1991)(en banc), cert

denied, 502 U.S. 941; Wishkin v. Potter, 476 F.3d 180, 187 (3d Cir. 2007); Stewart v. Rutgers, the

State Univ., 120 F.3d 426, 434 (3d Cir. 1997); Woodson v. Scott Paper Co., 109 F.3d 913, 923 (3d

Cir. 1997).

Risk did not "change his case and ... assert a claim under [the Police Tenure] Act." (Motion

for a New Trial at 4).   Instead, the contents of the Act were only introduced to show Defendant did

not follow a rule.  The Police Tenure Act required Defendant, in the event of a reduction in force,

to furlough its employees in reverse order of seniority. 53 P.S. § 813.  When Defendant retained less

---

[8]Defendant argues the Pennsylvania Police Tenure Act was sprung upon it at trial without any notice (Def.'s Brf. at 9). Either Defendant forgets what its own lawyer did, or it intentionally attempts to mislead this Court. Defendant was actually the one to raise the Act in the first place.  At Chief Roberts' deposition, Defense counsel asked point blank, "is there something called a police tenure act?" (Roberts Deposition at 151, App. Ex. 11).  When asked, "under the act does it state that part-time officers do not have any seniority status?" Roberts replied, "that's correct." (Roberts Deposition at 151, App. Ex. 11).  In fact, the Act states no such thing.  See generally 53 P.S. § 811 et seq. Risk requested the Court take judicial notice of the Act in order to prove Roberts lied under oath in his deposition and also to show that Defendant did not follow the very law its lawyer led Roberts to claim did not apply.

senior employees in favor of Risk, Defendant failed to follow a standard procedure.[9]

This Court properly took judicial notice of the Police Tenure Act, and properly determined it applied to this case.  Moreover, even if the Police Tenure Act did not apply, the error would be harmless because the Pennsylvania Borough Code would apply instead. *See* George v. Moore, 147 Pa. 148, 149 (Pa. 1959)("legislature intended to establish civil service removal procedures for all police officers regardless of the size of the police force").  Since both laws say the same thing–police officers must be furloughed in order of seniority–any error would be harmless. *See* 53 P.S. §§813; 46190.

Defendant's argument that it somehow falls outside the bounds of either law is without merit.  The Police Tenure Act applies to boroughs with a police force of less than three members, 53 P.S. §811, while the Borough Code applies to boroughs having three or more members. 53 P.S. §46171.  Because every police force necessarily has either less than three members or three or more members, one Act or the other must apply.  Moreover, the Police Tenure Act applies to boroughs "having a police force of less than three members and not subject to ... The Borough Code." 53 P.S. §811.  In short, if the Borough Code does not apply, the Police Tenure Act applies.  Therefore, Defendant was required to furlough its police force in order of seniority regardless of which Act applied.  *See also* George, 147 Pa. at 149. Further, either the Police Tenure Act or the Borough Code applies to Risk.

The Police Tenure Act applies to "regular full time police officers."  53 P.S. § 812; Petras v. Union Township, 187 A.2d 171, 173 (Pa. 1963); Mullen v. Borough of Parkesburg, 572 A.2d 859,

---

[9]*See* (3/25/08; 25-27, App. Ex. 1)(Nichols who was retained began employment in September 2004); (3/25/08; 136, App. Ex. 1)(Risk began employment in February 2002)–Defendant failed to follow a standard procedure.

861 (Pa. Commw. Ct. 1990).

Risk, while colloquially referred to as "part-time," clearly meets the legal definition of "regular full-time officer." "The phrase *full time employee* may be used to distinguish a permanent employee from a transitory or seasonal employee who is engaged to work only certain months of the year, on particular days of the week, or only a designated number of hours per day." Harlan v. Wash. Nat'l Ins. Co., 130 A.2d 140, 142 (Pa. 1957). "Full time employment does not mean full-time pay. It means being available for full employment." Id. at 143.

"If the legislature had intended the [Police Tenure Act] to apply only to these municipal police officers who worked five days or 40 hours a week or better, it could have been so stated." Petras, 187 A.2d at 175. The "legislature intended to cover those persons fulfilling **normal policing functions** as opposed to those who were employed for special circumstances, unusual conditions, or emergencies." Id. at 174 (emphasis added).

The fact Risk had another full-time job is of no moment.  In Droz v. Brownstown Borough, 43 Pa. D.&C.2d 205, 209 (Pa. Com. Pl. 1967), the court held the Police Tenure Act applied to a police officer who worked **three hours a week** and had another full-time job.  Like Risk, the plaintiff "performed regular police duties, such as criminal investigations, traffic, firearms and all police calls" and was "armed and provided uniforms" by the borough.  Id. at 206.

 Also like here, there was no testimony the plaintiff was ever unavailable despite his other job. Id. at 208. "[O]ther employment does not determine [Risk was] thereby unavailable when called, especially, as here, when there is no evidence so indicating."  Id. at 208-09.  In fact, Risk was

12

available for *all* shifts assigned to police officers.[10] (Trial Exhibit 11, App. Ex. 16).  Therefore, Risk was protected by the Police Tenure Act.

Unlike the Police Tenure Act, the Borough Code does not restrict is applicability to full-time officers.  "No *person* employed in any police or fire force of any borough shall be suspended, removed or reduced in rank ... If for reasons of economy or other reasons it shall be deemed necessary by any borough to reduce the number of *paid employees* of the police or fire force, then [borough must furlough according to seniority." 53 P.S. § 46190(emphasis added).

Therefore, the Borough Code applies to all *persons* and *paid employees* who work for a "police force."  A police force is a force where the members "devote their normal working hours to police duty ... and who are paid a stated salary or compensation." 53 P.S. § 46195.  Excluded from the definition of "police force" are "special police," metermaids, special school police, "extra police" serving from time to time or on an hourly or daily basis, and auxiliary policemen. Id.  Risk devoted normal working hours to police duty and was paid a stated compensation, and was not a "special," or "auxiliary," or "extra" policeman serving from time to time or on an hourly basis.

Even if Risk could be considered "extra," he does not need to be a full time officer to be protected by the Borough Code.  All *persons* and *paid employees* are protected, regardless of whether they meet the definition of "full time."  *See* 53 P.S. § 46190.

Either the Police Tenure Act or the Borough Code must apply to Defendant.  Either way, both Acts say the same thing-reduction in force must be done by seniority.  Therefore, the Court did not

---

[10]Risk worked his other job as a school bus driver Monday through Friday, 9:00 am-11:00 am, and 2:00 pm-4:00 pm. (3/25/08; 135, App. Ex. 1). Chief Roberts worked *alone* Monday through Friday, 8:00-4:00 pm (3/26/08; 35, App. Ex. 5); (Trial Exhibit 11, App. Ex. 16). In other words, Risk would not have been scheduled to work that shift even if he did not have another job.  Therefore, Mullen, 572 A.2d 859, cited by Defendant, is inapposite, because there the borough "work[ed] around" his other job. Id. at 860.  Defendant never had to "work around" Risk's other job, and also did not work around his church schedule. (3/25/08; 151, App. Ex. 1).

err in taking judicial notice that the law requires boroughs to furlough their police forces in reverse

order of seniority.

> ### 2.   The Court correctly permitted evidence that Chief Roberts–but not even one of its  elected officials–objected to Risk wearing a cross pin for the purpose of showing Roberts' anti-religious animus.

Risk offered evidence that Chief Roberts repeatedly asked him to remove his cross pin for

two reasons.  First, Roberts was the *only* one who had a problem with Risk wearing the cross pin,

and even told him he had to remove the pin after Risk had permission from Borough Council to wear

it.  (3/24/08; 79-80, App. Ex. 6); (3/25/08; 144-47, App. Ex. 1). This suggests anti-religious animus

on the part of Roberts, Risk's direct supervisor and a person who likely influenced the decision to

fire Risk. Second, Risk engaged in protected activity for purposes of his retaliation claim when his

attorney wrote a letter complaining the forced removal of the cross pin was religious

discrimination.[11]  (Trial Exhibit 2, App. Ex. 9). *See*  42 U.S.C. §2000e-(3)(a).

This Court correctly admitted evidence of Risk's cross pin because it was relevant under Fed.

R. Evid. 401 and was not barred by any other rule of evidence.  Notably, Defendant does not even

identify a rule that would bar its admission. *See* Def.'s Brf. at 15-18. Instead, Defendant only makes

the vague allegation that admitting the evidence was "contrary to the law." (Def.'s Brf. at 17).

This Court only held "Risk can premise no claim of *Constitutional* violation on a restriction

of his right to wear a symbol of his Christian beliefs...." (Summary Judgment Opinion at 3)(emphasis

added).  It does not follow from the lack of a First Amendment violation that evidence of Risk

---

[11]If an employee is retaliated against after his lawyer complains of discrimination, Title VII is implicated just as if the employee himself had complained, because people often act through agents such as lawyers. EEOC v. V&J Foods, Inc., 507 F.3d 575, 580 (7th Cir. 2007). Thus, Risk's lawyer's complaints of discrimination on his behalf is no different than Risk complaining. Id.

complaining about this action is not relevant or admissible.

> **a.** **Roberts' objection to the cross pin is evidence of his state of mind, especially when every other elected official approved Risk's wearing of the cross.**

Just because an employer's action is legal does not mean it is not evidence of discrimination. Indeed, courts have found many acts permissible under the Constitution and other laws to nonetheless be evidence of a discriminatory state of mind.  For example, while it is perfectly legal for an employer to have dress and grooming standards, the Supreme Court found *evidence* of a discriminatory animus when an employer told a female employee to dress more femininely, have her hair styled, and wear makeup and jewelry. Price Waterhouse v. Hopkins, 490 U.S. 228, 235, 251 (1989).  Similarly, though it is not illegal to comment on someone's age, the Supreme Court held aged-based comments well removed from the decision-making process were evidence of "age-based animus." Reeves, 530 U.S. at 151.[12]

Here, it is especially likely that Chief Roberts' instruction to Risk to remove his cross pin indicated discriminatory animus because no one else working for Defendant had *any* problem with Risk wearing the pin. (3/24/08; 79-80, App. Ex. 6); (3/25/08; 144-46, App. Ex. 1).  Even after Risk had express permission from Council to wear the pin, the Chief again told him to remove it. (3/25/08; 147, App. Ex. 1).  Although Chief Roberts now bases his dislike of the cross pin on separation of church and state, he never told Risk or anyone else that he had a constitutional reason for doing so.  (3/26/08; 65, App. Ex. 5).  In fact, this reason never surfaced until trial. (3/26/08; 14,

---

[12]*See also* Torre v. Casio, Inc., 42 F.3d 825, 834 (3d Cir. 1995); Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 334 (3d Cir. 1995); Roach v. Am. Radio Sys. Corp., 80 F. Supp .2d 530, 533 (W.D. Pa. 1999)(Ambrose, J.)(same).

App. Ex. 5). Therefore, the jury was entitled to find discriminatory animus from the Chief's reaction to the cross pin.

> **b.** **Evidence of Roberts' opposition to the Risk's wearing the cross pin, also is relevant to Risk's retaliation claim.**

To state a *prima facie* case of retaliation in violation of Title VII, a plaintiff need only show he opposed conduct he in good faith believed to be discriminatory. Clark Co. Sch. Dist. v. Breeden, 532 U.S. 268, 269-70, 121 S. Ct. 1508, 1509 (2001); Abramson, 260 F.3d at 286. In making this determination, the court must judge a plaintiff's good faith belief from the layperson's point of view, because "lack of knowledge concerning the precise parameters of Title VII does not remove her claim from the realm of good faith." Bianchi v. City of Philadelphia, 183 F. Supp.2d 726, 739 (E.D. Pa. 2002), *aff'd*, 80 Fed. Appx. 232 (3d Cir. Nov. 4, 2003); Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1986). Further, Title VII also protects an employee from retaliation because his employer *perceives* him to have engaged in protected conduct, even if she did not actually do so. Fogleman v. Mercy Hospital, Inc., 283 F.3d 561, 571-72 (3d Cir. 2002), *cert denied*, 537 U.S. 824, 123 S.Ct. 112 (2002).

In other words, an employee who opposes apparent discriminatory conduct need not be *right* to be protected against retaliation. Rather, he need only complain of discrimination, and act with a good faith belief that the conduct he opposes violates Title VII. Aman, 85 F.3d at 1095(protesting what an employee believes in good faith to be a discriminatory practice is *clearly* protected conduct)(emphasis added); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 190-191 (3d Cir. 2003)(requesting reasonable accommodation is protected conduct even if employee is not disabled within meaning of Americans with Disabilities Act); *See also* Hare v. H&R Industries, Inc., 67 Fed.

16

Appx 114, 118-119 (3d Cir. 2003)(not precedential)(complaint about rumor of an affair between plaintiff and supervisor leading to confrontation is "protected activity" for purposes of Title VII retaliation protection).

Here, evidence that Risk complained about the removal of the cross was both relevant under Fed.R.Evid. 401, and also highly probative, because it comprises one element of his retaliation case. Risk alleged he was retaliated against in a term or condition of employment because he complained about what he believed to be a discriminatory practice of Defendant. On December 7, 2004 Risk's lawyer wrote to Defendant and said as much. (Trial Exhibit 2, App. Ex. 9). Shortly thereafter, Risk was removed from the work schedule and subsequently fired.

The fact that the Court held Defendant did not *actually* violate the law by Chief Roberts ordering Risk to remove the cross does not mean that Defendant is free to retaliate against Risk for complaining that the cross removal order was a violation of Title VII. Drinkwater v. Union Carbide Corp., 904 F.2d 853, 865 (3d Cir. 1990)(Title VII plaintiff need not win his underlying discrimination claim to assert retaliation for the same asserted but unsuccessful discriminatory conduct).

Title VII provides that it is an unlawful employment practice to discriminate against any individual with respect to his terms, conditions or privileges of employment because of such individuals' religion 42 U.S.C. 2000e-2(a)(1). The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business. 42 U.S.C. §2000e(j). The wearing of jewelry or clothing or facial hair in the workplace is a term or condition of employment.

17

*See* Cloutier v. Costco Wholesale Corp., 390 F.3d 126 (1st Cir. 2004); EEOC v. United Parcel Service, 94 F.3d 314 (7th Cir. 1996);  Brown v. F.L. Roberts & Co., 419 F. Supp.2d 7 (D. Mass. 2006).

Therefore, it was reasonable for Risk to believe Defendant unlawfully discriminated against him in forcing him to remove his cross pin.  In fact, Defendant does not even allege it was unreasonable for Risk to believe the order to remove the cross constituted discrimination under Title VII.

Because the cross pin and its attending circumstances were highly relevant to Risk's retaliation claim, this Court correctly admitted it as evidence.

      **c.**    **The court properly permitted Risk to testify briefly about his decertification.**

Defendant next argues the Court erred in allowing Risk to testify about his decertification. However, Defendant ignores the fact that Risk moved *in limine* to exclude this evidence, and Defendant argued in opposition that the evidence was highly relevant.(Doc. No. 60); (Doc. No. 64). Given the Court's ruling that Risk's decertification was admissible for purposes of impeaching his credibility (3/18/08;14-30, App. Ex. 17), Risk testified to the circumstances of his decertification as it related to his credibility.

      **3.**    **Preclusion**

Though Defendant correctly asserts the Municipal Police Officers Education and Training Commission's and Commonwealth Court's decisions revoking Risk's certification would be entitled to preclusive effect if collaterally attacked, Risk in no way attempted to relitigate the issue. Therefore, the doctrine of preclusion is inapplicable.

In order for preclusion to apply, issues must be *identical*. <u>In re Iulo</u>, 766 A.2d 335, 337 (Pa. 2001); <u>Safeguard Mut. Ins. Co. v. Williams</u>, 345 A.2d 664, 668)(Pa. 1975)(in the absence of identity of issues, neither res judicata nor collateral estoppel applies).[13]

Here, the issues before the Commission and this Court were not even remotely identical. The Commission decided whether Risk's certification was valid. On the other hand, this Court decided whether Defendant fired Risk because of his religion and/or in retaliation for complaining about religious discrimination. The Commission was not concerned with why Risk was fired, because the certification proceedings dealt with Risk's police training *before* he worked for Defendant. Similarly, Risk's discharge had nothing to do with whether he was certified, and in fact, he *was* certified when he worked for Defendant.

At trial, Risk did not claim he was certified. To the contrary, he admitted in open court he was *decertified*. (3/25/08; 140-41, 184-85, App. Ex. 1). As such, he did not seek to relitigate the issue.

Though Defendant claims this Court allowed Risk to "contest or question the validity or fairness of the Commission's decision (and allow the jury to do the same)" (Def.'s Brf. at 18), Defendant does not give even one example of Risk challenging the validity or fairness of the decision. Indeed, there are none. Risk only testified to the Commission's determination that his certification was issued in error, and the circumstances leading to that error; namely, the confusion in the meanings of "full time" and "full time capacity" in Pennsylvania and Ohio. (3/25/08; 140-42,

---

[13] "A federal court in a Title VII action should grant preclusive effect to a state court decision upholding a state administrative agency determination when the state court's decision would be barred by issue preclusion in subsequent actions in that state's own courts." <u>Dici v. Pennsylvania,</u> 91 F.3d 542, 547-48 (3d Cir. 1996)(citing <u>Kremer v. Chemical Const. Corp.</u>, 456 U.S. 461, 476-78 (1982)).

App. Ex. 1).  Risk did not claim the Commission was wrong, but merely explained he did not receive his certification as a result of an intentional lie by his former chief concerning the meaning of "full time capacity." (3/25/08; 140-42, App. Ex. 1).  Since Defendant attempted to impeach Risk's credibility by introducing evidence of his decertification, Risk was justified in testifying to his state of mind when applying for Pennsylvania certification.

Moreover, Defendant waived any objection to Risk's testimony about his certification because it failed to object during trial.  *See* Walden v. Georgia-Pacific Corp., 126 F.3d 506, 517 (3d Cir. 1997).

Because Risk did not relitigate the issue of his certification, preclusion does not apply.

### 4.    Risk's qualifications

Defendant claims it is entitled to judgment as a matter of law because Risk's decertification more than two years after it fired him somehow made him unqualified for purposes of  his prima facie case.[14]  However, Risk *was* qualified at the time Defendant fired him, and "qualification" is determined by what the employer knew at the time of the adverse employment action. Bowers v. NCAA, 475 F.3d 524, 536 (3d Cir. 2007); Mardell I, 31 F.3d at 1228-30.

To determine whether a plaintiff is "qualified," "what is relevant to the inquiry is the employer's subjective assessment of the plaintiff's qualifications, not the plaintiff's objective ones if unknown to the employer." Mardell I, 31 F.3d at 1230.  Moreover, a defendant "can only rely on a legitimate motive it held *at the time of the adverse employment decision*." Id. at 1229 (emphasis in original).  Further, "after-acquired evidence is irrelevant at the liability stage." Id. at 1228. Since

---

[14]Defendant acknowledges it cannot use Risk's decertification as its legitimate non-discriminatory reason under McKennon, 513 U.S. at 360 ("the employer could not have been motivated by knowledge it did not have"). *See* (Def.'s Brf. at 29-30).

the prima facie element of "qualification" is determined at the liability stage, after acquired-evidence must also be irrelevant in that determination.

More recently, in an Americans with Disabilities Act case, the Third Circuit held the issue of qualification "is not made from the time the lawsuit was filed or any other later time period, but from *the point at which the alleged discriminatory decision was made*." Bowers, 475 F.3d at 536 (emphasis added).  In that case, like here, the defendants attempted to use after-acquired evidence of the plaintiff's drug abuse to assert that he was unqualified to play sports at any university at the time it made its decision to disqualify him. Id. at 534.  The Third Circuit rejected this: "Defendants' argument that Bowers was unqualified at the relevant time frame as a result of his drug abuse rests on the erroneous assumption that Defendants could have used evidence of Bowers' drug abuse as an after-the-fact justification for their allegedly discriminatory conduct." Id. at 537.  *Citing* McKennon, the court held the defendants could not claim that the plaintiff was unqualified based on after-acquired evidence. Id.  Therefore, it is clear that the Third Circuit interprets McKennon not just to bar the use of after-acquired evidence as a legitimate non-discriminatory reason, but also to preclude such evidence for purposes of determining whether a plaintiff is "qualified."

McNemar v. Disney Store, 91 F.3d 610 (3d Cir. 1996)[15], cited by Defendant, does not compel a different result.  On remand, the District Court in Bowers expressly rejected the argument that the after-acquired evidence rule of McKennon and Mardell did not apply to the plaintiff's prima facie case. Bowers, __ F. Supp.2d __, 2008 WL 2588058 at *17-19 (D. N.J. July 1, 2008).  Similar to

---

[15]McNemar, as well as McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558 (5th Cir. 1998), also cited by Defendant, was overruled by Cleveland v. Policy Mgmt Sys. Corp., 526 U.S. 795 (1999), on the related issue of whether a plaintiff is judicially estopped from claiming he was qualified under the ADA after claiming total disability in a social security claim. *See* Montrose Med. Group Participating Savings Plan v. Bulger, 243 F.3d 773, 784 n. 9 (3d Cir. 2001)(recognizing abrogation).

Defendant's argument here, the NCAA argued, "if Plaintiff cannot prove that Bowers was otherwise qualified, she cannot make out a prima facie case and the burden never shifts to the defendant." Id. at *17. However, the court held, notwithstanding McNemar, the Third Circuit's holding in Bowers, 475 F.3d at 537, was "unmistakable:" "the after-acquired evidence doctrine is applicable to the question of whether Bowers was otherwise qualified." Id. at *18-*19.

Finally, Risk *was* qualified at the time Defendant fired him. In the typical after-acquired evidence case, something happened *before* the plaintiff was fired that the employer did not find out until *after* firing him. See McKennon, 513 U.S. at 355 (removing documents while employed); Mardell II, 65 F.3d at 1073 (lying on resume before employment); Bowers, 475 F.3d at 534 (drug abuse while playing sports for defendant). Here, on the other hand, Risk did not lose his certification until well into this litigation, and over two years after Defendant fired him.[16] Therefore, Risk's status as a certified police officer does not reflect merely what Defendant *knew* when it fired him, but the facts as they existed at that time. *Cf.* Kurten v. Hanger Prosthetic & Orthotics, Inc., 402 F. Supp. 2d 572, 583 (W.D. Pa. 2005)(ADA prima facie case to be determined *at the time of adverse employment action*); Lit v. Infinity Broadcasting Corp. of Pa., 423 F. Supp. 2d 485, 490 (E.D. Pa. 2005)(ADEA protected class determination made *at time of adverse employment action*).

Therefore, this Court did not err in denying Defendant judgment as a matter of law based on Risk's decertification.

---

[16]Though Defendant claims Risk's certification was void *ab initio,* it does not cite any authority on point. (Def.'s Brf. at 29). While the Commission may have determined that it should never have certified Risk, the fact of the matter is it *did* certify him. It *revoked* his certification; it did not erase history. Taken to its logical end, Defendant's argument would mean that every arrest Risk made while improperly certified was illegal because he was never certified to begin with.

### C.      Prevost's Conversation with Chief Roberts

Chief Roberts' admission to  Prevost that Risk would be fired because he attended church, and Prevost's written statement that was shared with every member of Borough Council, are admissible as circumstantial evidence of discrimination.

Even if Chief Roberts was not the actual decisionmaker, discriminatory comments by non-decisionmakers may properly be used to build a circumstantial case of discrimination.[17] Abrams, 50 F.3d at 1214.[18]  Likewise, discriminatory statements of a  person *involved in* the decision is imputed to the employer.  *See* Abramson, 260 F.3d at 286; *see also* Potence v. Hazleton Area School Dist., 357 F.3d 366, 371 (3d Cir. 2004).  In Abramson, the Court held that statements of  a person who merely participates in the decision at issue can be  imputed to the employer. Id., 260 F.3d at 286.[19]

Here, at a minimum, Chief Roberts played a role in the decision to eliminate Risk.  Chief Roberts even admitted that Council member Johnson asked him about the availability of certain part time police officers.  (3/26/08; 41).  As the Third Circuit held, in such a situation, the animus of any person involved in the decision is imputed to the actual decisionmaker, and hence to the employer. Olson v. General Electric Astrospace, 101 F.3d 947, 954-55 (3d Cir. 1996); Abramson, 260 F.3d at

---

[17]Likewise, Lt. Murray's comment about the need to take Tylenol because Risk might start preaching is also evidence of the workplace culture.  Defendant's analogy to hostile work environment claims fails.  (Def.'s Brf. at 21, n. 2). Discriminatory comments are not required to rise to the level of a hostile work environment in order to be evidence of workplace culture. *Cf.* Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 132-133 (3d Cir. 1997); Abrams v. Lightolier Inc., 50 F.3d 1204, 1214 (3d Cir. 1995); Glass, 34 F.3d at 194-95. Finally, Defendant never objected to the jury instruction on culture, and therefore that objection is waived. (*See* 3/26/08; 150-208, App. Ex. 5); (3/27/08; 1-23, App. Ex. 18). Ryder, 128 F.3d at 135.

[18]Ryder, 128 F.3d at 132; Brewer., 72 F.3d at 333(question of weight that non decisionmaker remarks entitled to be given is for the factfinder).

[19]Roebuck v. Drexel University, 852 F.2d 715, 727 (3d Cir. 1988)(Jury could conclude evaluation at any level, if based on discrimination, influenced decision process and allowed discrimination to infect ultimate decision).

286; Abrams, 50 F.3d at 1214.

      1.      **Hearsay**

          a.      **Not offered for truth**

At the outset, Chief Roberts' conversation with Amy Prevost was not hearsay at all, as it was not "offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c).

Chief Roberts stated Risk's church interfered with his job and he was not available to work the Saturday night-Sunday morning shift because of his church attendance. (3/25/08; 50, App. Ex. 1). The statement was not offered to prove Risk's church *actually* interfered with his job, or that he was *actually* unavailable for the Saturday night-Sunday morning shift. Rather, Chief Roberts' statement, and Ms. Prevost's memo outlining that statement, was offered to show the Chief said such a thing, and that every member of Borough Council was aware of the Chief's opinion on who should be eliminated in the upcoming reductions.

Further, the Roberts' comment and Prevost statement were also offered as circumstantial proof of the managerial viewpoint concerning police officers who may have religious obligations that interfere with work, that prevailed in Burgettstown when Risk was eliminated. In Ryder, 128 F.3d at 131, 134, the plaintiff offered statements made by Westinghouse managers including: that it had an older work force, which strained opportunities for younger workers and therefore did not have enough people ages 30-40; that "an eager high energy person will get more done in one month;" that Westinghouse seemed to be missing people in the middle of the age range; and that blockers had to be moved aside to make room for younger high energy people. Over a hearsay objection, the Third Circuit held these statements were not hearsay at all because they were not offered for their truth. Id., 128 F.3d at 134. Roberts' comments showed the same type of managerial attitude as Ryder, and

therefore were not offered for their truth.

###### b.      Party admission

Even if Chief Roberts' statement and Prevost's memorandum outlining that statement were offered to prove the truth of the matter asserted, it was not hearsay because Chief Roberts is an agent of Burgettstown.   Because Chief Roberts' statement concerned a matter within the scope of his agency, and made during the scope of that relationship, it is not hearsay under Fed.R.Evid. 801(d)(2)(D).

Under Rule 801(d)(2)(D), the agent need not have authority to make a statement on a particular subject. Rule 801(d)(2)(D) requires only that the statement "concern a matter within the scope of the agency."  The word "agent" in Rule 802(d)(2)(D) is broadly defined. Thus, the Third Circuit has held that even unidentified participants at a meeting who made age pejorative statements were agents of an employer because they had been identified as having authority to make personnel decisions. Ryder, 128 F.3d at 134.[20]

Here, Chief Roberts was an agent of Burgettstown.  Defendant's Council President Pam Church and Chief Roberts consulted with each other on various matters affecting the police department. (3/24/08; 65, App. Ex. 6) Church consulted Roberts when she drafted new police manuals. (3/24/08; 65, App. Ex. 6).  When Church was doing a cost study of the police department, she and Chief Roberts had discussions about the officers and their salaries. (3/24/08; 82-83, App. Ex. 6).  Chief Roberts consulted Pam Church when he was having a difficult time filling the

---

[20]See also Yates v. Rexton, Inc., 267 F.3d 793, 801-02 (8th Cir. 2001)(advisor involved  in party's employment decision is agent for purposes of Rule 801(d)(2)(D)); Larch v. Mansfield Mun. Elec. Dept., 272 F.3d 63, 72 (1st Cir. 2001)(statement of Commissioner, since deceased, that related to matter within scope of agency admissible).

midnight shifts, and they decided to discontinue those shifts. (3/24/08; 65, App. Ex. 6).

Moreover, Roberts verified Defendant's response to Risk's PHRC complaint. (Trial Exhibit 5, App. Ex. 2). Defendant was apparently sufficiently satisfied with Roberts' knowledge of the circumstances of Risk's termination that it authorized Chief Roberts to verify its response.

Chief Roberts clearly was authorized to speak about Burgettstown's employment practices, and, as set forth above, his opinion on police department matters is regularly sought by Borough Council members. (3/24/08; 65, App. Ex. 6). Indeed, Church assumed Chief Roberts was involved in recommending who would be eliminated and retained. (3/25/08; 31, App. Ex. 1). Further, his "opinion" about who would be retained was exactly what happened. The Third Circuit has held that statements by people with authority to speak about such matters are admissible against the employer. *See* Abrams, 50 F.3d at 1216.

### c.    Notice

Likewise, Ms. Prevost's written statement outlining Chief Roberts' remarks to her is not hearsay because it is offered to show notice to Defendant's decision makers and therefore to support Risk's retaliation claim. Risk's legal counsel sent Ms. Prevost's written statement to every member of Burgettstown Borough Council. (Trial Exhibit 2, App. Ex. 9). The statement and the attorney's letter complained of discrimination. Shortly after, Risk was removed from the work schedule and later fired. Thus, the Prevost written statement is not hearsay at all because it is offered to show that Defendant was aware of Risk's opposition to what he believed to be discrimination–one element of Risk's retaliation claim.

### 2.    Personal knowledge

First, admissions by a party-opponent do not need to be based on personal knowledge to be

admissible.  *See* <u>Marra.</u>, 497 F.3d at 297-98; <u>Abrams</u>, 50 F.3d at 1216.[21]  Since Chief Roberts'

conversation with Amy Prevost was an admission by a party opponent, whether or not he had

personal knowledge is immaterial.

Second, there is sufficient evidence that Chief Roberts *did* have personal knowledge.  Just

as Chief Roberts told Amy Prevost, Lt. Murray was retained while Risk and Augie Mondin were

fired. (3/24/06; 54; 95, App. Ex. 6).  The very fact these "predictions"came true raises a question of

fact whether he actually knew who would be fired.  Further, Pam Church claimed to rely on the Chief

in voting to fire Risk,  (3/24/08; 103, App. Ex. 6), and assumed he was involved in the decision.

(3/25/08; 31, App. Ex. 1). The Chief and Lt. Murray made the schedules that determined Risk's

"availability," which was supposedly considered in the decision of who to fire. (3/26/08; 19, App.

Ex. 5).  Therefore, the jury could have found Chief Roberts had personal knowledge of who would

be fired when he spoke with Amy Prevost.

### D.  Deposition Testimony of Dan Johnson

Under <u>McDonnell-Douglas</u>, Defendant had the burden of asserting a legitimate non-

discriminatory reason for firing Risk. <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973).

As stated above, this means the employer must show why it chose to discharge the *plaintiff*, not just

why it chose to discharge employees in general.  *See* <u>Tomasso</u>, 445 F.3d at 707 .

As this Court recognized, Defendant had not met its light burden at the close of Risk's case-

in-chief.  (3/25/08; 197, App. Ex. 1): "Your reason that you gave was why you laid off, why you laid

off anyone.  You never got beyond, at least at this point, why it was Risk and not Pompe or one of

---

[21]*See also* Advisory Committee Note, Fed. R. Evid. 801(d)(2)("the freedom which admissions have enjoyed
from ...the restrictive influences of the opinion rule and the rule requiring firsthand knowledge, when taken with the
apparently prevalent satisfaction with the results, calls for generous treatment of this avenue to admissibility").

the other two that were kept. I'm not even sure at this point that the burden does shift back").  Risk, therefore, had no need to call Dan Johnson to further contradict a reason that had not yet even been asserted.[22]

Further, it is unclear that Defendant even offered a legitimate non-discriminatory reason during its case-in-chief.  Chief Roberts denied having any role the decision (3/26/08; 76-78, App. Ex. 5). He also claimed he believed Dan Johnson and Mayor McCracken were involved in the decision to fire Risk. (3/26/08; 78, App. Ex. 5). Council member Andrew Miller testified he relied solely on the recommendation of Dan Johnson when voting to fire Risk. (3/26/08; 98-99, App. Ex. 5).  The only other witness Defendant called was Borough Solicitor Robert Clarke, who only challenged the Court's prior ruling on the Police Tenure Act and did not offer any evidence regarding the circumstances of Risk's discharge. (*See* 3/26/08; 103-130, App. Ex. 5).

Assuming Defendant's case-in-chief *did* assert a legitimate, non-discriminatory reason (a point which Risk does not concede), all signs pointed to Dan Johnson being a decision-maker. Miller claimed to rely solely on Dan Johnson. (3/26/08; 98-99, App. Ex. 5). Chief Roberts believed Johnson and Mayor McCracken made the decision, and McCracken had already testified he had no role in the decision. (3/25/08; 118, App. Ex. 1).  Pam Church relied on Johnson; the Chief, and the mayor (3/24/08; 104, App. Ex. 6).  Both the mayor (3/25/08; 115, App. Ex. 1) and the Chief (3/26/08; 76-78, App. Ex. 5) denied having any role in the decision, leaving Dan Johnson as the only decision-maker Defendant acknowledged.  However, the jury never heard from Johnson about what

---

[22]While Defendant claims Risk had no reason not to release Johnson from his subpoena (Def.'s Brf. at 24), Defense counsel had already complained about Risk's counsel telling the mayor he would not be needed to testify until the next day.  (3/25/08; 17-18, App. Ex. 1); (3/27/08; 16, App. Ex. 18). After the Court told Risk's counsel not to have any more contact with defense clients, Johnson was not released from his subpoena.

was on his mind when he made the decision.

Since the legitimate non-discriminatory reason did not surface until Defendant's case in chief (if at all), Risk was entitled to prove on rebuttal that the reason was a pretext for discrimination. A few lines from Johnson's deposition testimony sufficed to show he decided to fire Risk based on a lack of availability during church hours (3/26/08; 148, App. Ex. 5); i.e. the reason was neither "legitimate;" "non-discriminatory;" nor for that matter, "true."

If Defendant wanted to further develop Johnson's testimony, it had the right to do so. Defendant now claims it lost the opportunity to cross-examine Johnson in front of the jury, and that the option of introducing additional deposition testimony was "unreal and unfair." (Def.'s Brf. at 25). However, this Court told Defendant's counsel Johnson could testify in person. (3/26/08; 141-42, App. Ex. 5). The Court also gave Defense counsel time to review the deposition to supplement the portions Risk selected (3/26/08; 142-44, App. Ex. 5). Defense counsel declined to take advantage of this opportunity. (3/26/08; 148-49, App. Ex. 5). Finally, the Court offered to re-open the case and allow Johnson to testify in person *after* both parties rested. (3/27/08; 16, App. Ex. 18). Given all the opportunities Defendant had to develop Johnson's testimony, it cannot now claim those opportunities were unreal or unfair.

Finally, even if this Court erred in admitting Johnson's deposition testimony, the error was harmless. . "In light of the total record here ... no jury would have found for Defendant solely on based on the absence of [Dan Johnson's testimony]." Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 357 (3d Cir. 1999); Hurley, 171 F.3d at 121. Without the 10 or so lines of testimony, the case would have concluded with Defendant never offering a single person who owned up to making the decision to fire Risk. This itself was evidence of pretext. *See* Sabbrese, 320 F. Supp. 2d at 326.

29

Johnson's deposition testimony only showed that he relied on Risk's "availability," a reason which had already been discredited through other witnesses at trial. Therefore, the jury very likely would have reached the same result without hearing the few lines of testimony.

### E.        The Court Properly Instructed the Jury

Defendant argues the Court erred either in instructing, or failing to instruct, the jury on the following issues: the Pennsylvania Police Tenure Act; Chief Roberts' direction to remove the cross pin; Risk's decertification; Defendant's failure to produce Council meeting tapes in discovery; and Defendant's workplace culture. However, the Court's instructions on these issues were proper.

### 1.        Police Tenure Act

The Court did not err in instructing the jury about the Police Tenure Act, which was offered solely to prove Defendant departed from its own policies. Defendant claims "the effect of the question was to draw for the jury ... the legal and factual inference that defendant's explanation for discontinuing plaintiff's employment and its explanation that religion was not a factor in that decision were pretextual. That was tantamount to directing a verdict for plaintiff..." (Def.'s Brf. at 45). However, the Court did not tell the jury it was *required* to find pretext, but only that "the evidence *may* only be considered by you *in determining* whether the Borough's reasons for terminating Mr. Risk were pretext." (3/27/08; 85-86, App. Ex. 18)(emphasis added).

The instruction on the Police Tenure Act was a perfectly accurate explanation of the law. An employer's failure to follow its own policies is evidence of pretext. Colgan, 935 F.3d at 1422-23; Wishkin, 476 F.3d at 187; Stewart, 120 F.3d at 434;Woodson, 109 F.3d at 923. Therefore, the jury was entitled to consider the failure to follow the Police Tenure Act as evidence of pretext.

Finally, even if the instruction were incorrect (which it was not), it would be harmless error.

"In light of the total record here ... no jury would have found for [Risk] solely on the basis of the [Police Tenure Act] instruction." Pivirotto., 191 F.3d at 357; Hurley, 171 F.3d at 121. Even without the instruction, the evidence of pretext was overwhelming. For example, Defendant claimed to fire Risk because he was unavailable for a shift that no longer existed (Trial Exhibits 3, App. Ex. 7); (Trial Exhibit 5, App. Ex. 2); Defendant told the PHRC it fired employees based on performance, but later denied it (Trial Exhibit 5, App. Ex. 2); Chief Roberts told Amy Prevost Risk would be fired because he had to go to church (3/25/08; 50, App. Ex. 1); borough council failed to consider the letter from Risk's attorney complaining about religious discrimination (3/25/08; 155, App. Ex. 1); Andrew Miller called Ms. Prevost's statement regarding her conversation with Chief Roberts "garbage" (3/26/08; 94-95; 100-02, App. Ex. 5); Defendant failed to schedule Risk after he complained of discrimination (3/25/08; 155, App. Ex. 1); and Defendant never offered a reason for why it chose to fire Risk as opposed to the other police officers (3/25/08; 197, App. Ex. 1). Even without considering the Police Tenure Act, the jury still had sufficient evidence to find for Risk.

## 2. Cross pin

First, this Court correctly instructed the jury that it could infer discriminatory animus from Chief Roberts' direction to remove the cross pin, notwithstanding his constitutional right to do so. Second, even if the instruction was erroneous, this error was harmless.

At the outset, Defendant incorrectly asserts the instruction "told the jury what legal and factual inference to draw from the cross pin removal requests" and "the instruction again amounted to a directed verdict for plaintiff." (Def.'s Brf. at 46). To the contrary, the Court stated "**you may, if you wish**, consider the fact that the Chief of Police asked Mr. Risk to remove his cross pin as evidence of discriminatory animus." (3/27/08; 87, App. Ex. 18)(emphasis added). This did not *tell* the jury

31

which inference to draw, but merely told the jury the inference was permissible.

In addition, the Court prefaced the instruction by stating an employer may prohibit its police officers from wearing religious symbols on their uniforms, and does not infringe the officer's Constitutional rights by doing so. (3/27/08; 86-87, App. Ex. 18). This informed the jury that it was *not* required to find discriminatory animus from Chief Roberts' direction to remove the cross pin. Roberts testified he did not wear religious articles on his uniform because of the United States Constitution and separation of church and state. (3/26/08; 14, App. Ex. 5). The instruction made clear the Chief's explanation was legally valid if true, and left it up to the jury to decide whether to believe or disbelieve whether the Chief sincerely meant what he said, or whether it was a pretext for discrimination, especially in the face of *every* other elected official testifying there was no problem with Risk wearing the cross.

Indeed, it bolstered Roberts' claim that he was acting as a guardian of the Constitution–even when the elected officials of Burgettstown testified they had no problem with the cross pin. (3/26/08; 64-65, App. Ex. 5).

Further, the Court instructed the jury, in the middle of Pam Church's testimony and the first time the cross pin was referenced at trial: "it's not a violation of the law, per se, for the defendant borough to instruct its employees as to what they can and cannot wear on their uniforms." (3/24/08; 78, App. Ex. 6).

Finally, even if the instruction was incorrect (which it was not), it would be harmless error. "In light of the total record here ... no jury would have found for [Risk] solely on the basis of the [cross pin] instruction." Pivirotto,191 F.3d at 357; Hurley, 171 F.3d at 121. As explained above, even without this instruction, the evidence of pretext was overwhelming. As such, the jury was entitled

to find for Risk even if it did not consider the removal of the cross pin as evidence of discriminatory animus.

### 3. Decertification

Defendant next claims the jury verdict slip should have asked whether Risk was "qualified." However, since Risk's subsequent decertification did not make him "unqualified" as a matter of law, the Court did not err in failing to instruct the jury that plaintiff was unqualified. (3/27/08; 83, App. Ex. 18). *See* McKennon, 513 U.S. at 360; Mardell II, 65 F.3d at 1073; Bowers, 475 F.3d at 536.

By failing to object, Defendant has waived the argument that the verdict slip should have asked whether Risk was qualified. (*See* Def.'s Brf. at 44). "A party who objects to an instruction or failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds of the objection." Fed. R. Civ. P. 51(c)(1). If there is no objection before the jury deliberates, the objection is waived. Neely v. Club Med Mgmt. Servs., Inc., 63 F.3d 166, 200 (3d Cir. 1995); Henderson v. Chartiers Valley Sch., 136 Fed. Appx. 456, 459 (3d Cir. 2005)(applying standard to verdict slip).

Defendant's proposed verdict slip contained three questions, none of which mentioned Risk's qualifications or decertification. (Doc. No. 101). Further, rather than objecting at trial to the verdict slip, Defendant merely stated, "The defendant, based on prior rulings, probably, the Court will disagree, but we feel there is also a question on the verdict slip as to whether he was qualified for the position." (3/27/08; 21, App. Ex. 18). "We feel there is also a question on the verdict slip" does not state "distinctly the matter objected to and the grounds of the objection." Fed. R. Civ. P. 51(c)(1), as it is vague and almost incoherent. *See* Collins v. Alco Parking Corp, 448 F.3d 652, 656 (3d Cir. 2006)(failure to cite authority and explain the harm of the instruction, along expression of doubt and

uncertainty, insufficient to constitute objection).  Therefore, Defendant has waived the objection to
the verdict slip.

### 4.    Adverse inference

When a party fails to disclose information in discovery, the court may inform the jury of the
party's failure. Fed. R. Civ. P. 37(c)(1)(B). This includes an instruction to the jury that it may draw
an adverse inference from a party's failure to produce information. Residential Funding Corp. v.
Degeorge Financial Corp., 306 F.3d 99, 106 (2d Cir. 2002). Courts also have an inherent power to
impose sanctions for misconduct in discovery. Id. at 106-107.

At trial, Council President Pam Church informed Risk and his counsel for the first time that
the meeting announcing which officers would be fired had been videotaped. (3/24/08; 83, App. Ex.
6); (3/25/08; 102, App. Ex. 1).  Though Defendant faults Risk for "never pursu[ing] the issue in
discovery," (Def.'s Brf. at 27), Risk asked for "*any and all* Burgettstown meeting minutes, tapes, or
transcripts from October [2004] to the present." (Trial Exhibit 7A, App. Ex. 14)(emphasis added).
Defendant responded with "see attached," which provided a list of minutes. (Trial Exhibit 7A, App.
Ex. 14). Defendant never provided any tapes, nor even acknowledged that tapes existed. (3/26/08;
188, App. Ex. 5).  Pam Church verified the response was "true and correct" (Trial Exhibit 7A, App.
Ex. 14), and then herself testified *twice* that tapes existed. (3/24/08; 83, App. Ex. 6); (3/25/08; 102,
App. Ex. 1).

Despite Defendant's argument to the contrary, the Court *did* consider the Schmid factors: the
degree of fault of the party who altered or destroyed the evidence, the degree of prejudice suffered
by the opposing party, and the availability of a lesser sanction that will avoid substantial unfairness
to the opposing party's and deter future similar conduct.  Schmid v. Milwaukee Electric Tool Corp.,

13 F.3d 76, 79 (3d Cir. 1994).

As to the first factor, Defendant's degree of fault, the Court stated, "it's not your fault, but it's your *client's fault.* They should have produced [the tapes]." (3/26/08; 193, App. Ex. 5)(emphasis added). Additionally, the court said "your client, perhaps, wasn't paying any attention and should have said to you, hey, by the way, we have tapes." (3/26/08; 193, App. Ex. 5).

In other words, the Court found Defendant was at least negligent in failing to produce the tapes. "The sanction of an adverse inference may be appropriate in some cases involving negligent destruction of evidence because each party should bear the risk of its own negligence."Residential Funding Corp. v. Degeorge Financial Corp., 306 F.3d 99, 108 (2d Cir. 2002). "The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss." Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 75 (S.D. NY. 1991).

Further, whether or not defense counsel knew of the existence of the tapes before trial, Pam Church revealed their existence the first day of a four-day  trial. (3/24/08; 83, App. Ex. 6).  She was again asked on the second day of trial whether she brought the tapes, and still did not produce them. (3/25/08; 102, App. Ex. 1). Therefore, Defendant was sufficiently at fault to warrant the adverse inference instruction.

With respect to the degree of prejudice Risk suffered, the Court explicitly stated, "[t]here was a lot of testimony about what was said at this meeting, and what Dan Johnson did and did not do, and what he looked at, and Dan Johnson made a statement in the minutes that the mayor did certain things that the mayor denied.  It's a pretty big issue. Really." (3/26/08; 195, App. Ex. 5).  In other words, Defendant's failure to allow Risk to inspect the tape of the meeting, or to even mention the existence

35

of the tapes, resulted in prejudice to Risk.

As to the last factor, the availability of a lesser sanction, Defendant never suggested one that would avoid substantial unfairness to Risk and deter future similar conduct.  Indeed, such a sanction is hard to imagine at or after trial.  Nonetheless, the Court did not instruct the jury that it *must* draw an adverse inference, but rather "the general rule is that where evidence is in the control of a party, and that party fails to produce it, you **may** draw the inference that, if produced, it would be unfavorable to that party." (3/27/08; 79, App. Ex. 18).  This was less severe than the sanction in Schmid, where the district court struck an expert's testimony in its entirety because the expert altered evidence during his examination.  Schmid, 13 F.3d at 77, 79 (sanction "far more serious than spoilation inference").[23]

Therefore, the Court did not err in giving the adverse inference instruction.

### 5.      Workplace culture

First, Defendant never objected to the instruction on workplace culture before the jury deliberated.  *See* (3/26/08; 150-208, App. Ex. 5).  Therefore, the objection is waived.  *See* Fed. R. Civ. P. 51(c)(1);  Neely,63 F.3d at 200.

Second, the instruction was not erroneous.  Workplace culture[24] may be considered as evidence of discrimination. *See* McDonnell Douglas, 411 U.S. at 802-04; Ryder, 128 F.3d at 132 (3d

---

[23]*See also* Dillon v. Nissan Motor Co., 986 F.2d 263, 269 (8th Cir. 1993), *cited in* Schmid, 13 F.3d at 79 (district court did not err in giving adverse inference instruction *and* excluding testimony and exhibits when opposing party destroyed evidence).

[24]Defendant's reliance on the passage from Harris v. Forklift Sys, 510 U.S. 17, 21-22 (1993), is misplaced. *See* Def.'s Brf. at 50.  The Court made the statement "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation" in the context of a hostile work environment claim. Id.  This was not a hostile environment case. Even when statements *themselves* do not constitute a Title VII violation, they clearly can be circumstantial *evidence* of discrimination.  *See, e.g.,* Ryder, 128 F.3d at 132; Abrams, 50 F.3d at 1214.

Cir. 1997); Brewer, 72 F.3d at 333-34; Abrams, 50 F.3d at 1214; West v. Phila. Elec. Co., 45 F.3d

744, 757 (3d Cir. 1995); Glass, 34 F.3d at 194-95; Josey v. John R. Hollingsworth Corp., 996 F.2d

632, 641 (3d Cir. 1993).

Though Defendant claims the instruction was impermissibly broad, it is completely unrealistic

that the jury would consider immaterial evidence "Chief Roberts' preference for TV dinners" or

"whatever the jury believed was wanting in the operations of the Police Department or of Borough

Council" as evidence of a discriminatory environment. (Def.'s Brf. at 51). This is especially so given

the instruction "you cannot find intentional discrimination simply because you disagree with the

business judgment of the Borough or believe it is harsh or unreasonable. You are not to consider the

Borough's wisdom." (3/27/08; 84, App. Ex. 18). Because the jury knew it was Risk's burden to prove

discrimination, and this required disbelieving Defendant's legitimate non-discriminatory reason

(assuming it offered one), it would not have considered immaterial facts in determining pretext. *See*

(3/27/08; 83, App. Ex. 18). Therefore, the instruction was not error.

### F.     The Court Properly Awarded Backpay

First, the decision to award backpay is within the trial court's discretion. Mardell II, 65 F.3d

1074 n. 4. Therefore, despite Defendant's argument to the contrary, the award of backpay is not

grounds for judgment as a matter of law or a new trial. Further, the Court correctly awarded back pay

in this case.

"[G]iven a finding of unlawful discrimination, backpay should be denied only for reasons

which, if applied generally, would not frustrate the central statutory purposes of eradicating

discrimination throughout the economy and making persons whole for injuries suffered through past

discrimination. It is necessary, therefore, that if a district court does decline to award backpay, it

37

carefully articulate its reason." Albemarle Paper Co. v. Moody, 422 U.S. 405, 421 & n. 14 (1975).

Even in cases of so-called "after-acquired evidence," an "absolute rule barring any recovery of backpay ... would undermine [employment discrimination laws'] objective of forcing employers to consider and examine their motivations, and of penalizing them for employment decisions that spring from ... discrimination." McKennon, 513 U.S. at 362.

The Supreme Court and Third Circuit have made clear that circumstances must be very extreme in order to justify not awarding back pay. Absent "truly exceptional circumstances," back pay should be awarded from the time of discharge to the time the employer discover's an employee's "wrongdoing." Mardell II., 65 F.3d at 1074. Although a court may consider "extraordinary equitable circumstances," McKennon, 513 U.S. at 362, the Third Circuit has not decided "the contours of the 'extraordinary equitable circumstances' doctrine." Mardell II, 65 F.3d at 1074 n. 4.   Moreover, Defendant has not cited any cases where an appellate court reversed a district court's award of backpay based on "extraordinary equitable circumstances."

What can be discerned from McKennon and Mardell, however, is stealing documents from an employer and lying on a resume do not preclude an award of backpay.  McKennon, 513 U.S. at 362; Mardell II, 65 F.3d at 1074.   Risk's decertification is less serious than these acts because it was issued "in error" rather than as a result of fraud.[25]  (MPOETC decision, App. Ex. 19).  Further, the

---

[25]On May 18, 2006, Defendant contacted the Municipal Police Officers Education and Training Commission (MPOETC) on May 18, 2006, with what it claims was a "general inquiry about certification procedures when an officer transfers employment with another state..."  (Trial Exhibit 8S, App. Ex. 20). Ironically, four days later, after an "anonymous telephone call," the Executive Director of the MPOETC sought verification of Risk's employment history, which set decertification proceedings in motion. (Proposed Adjudication and Order (A&O) at 8, App. Ex. 21).  If anything, it would be "extraordinarily inequitable" to allow Defendants to get away with discrimination and retaliation based on this questionable conduct. See Mardell I, 31 F.3d at 1237 ("barring all remedies would leave the victim in a worse position than had the employer not unlawfully discriminated against him or her ... and elevates the employer to a superior position insofar as it lets the employer get off scot-free despite its

(continued...)

38

decertification occurred *after* Defendant fired him, despite Defendant's unsupported argument it applied retroactively.  In any event, the decertification was not so "truly exceptional" from the run-of-the-mill employee misconduct case to justify denying an award of backpay.

Finally, the incongruity between decertified police officers and illegal immigrants obvious. *See* Def.'s Brf. at 33-34 (*citing* Sure-Tan, Inc. v. NLRB, 467 U.S. 883 (1984); Hoffman Plastic Compounds, Inc. v. NLRB, 535 U.S. 137 (2002)).  In Hoffman, the Court distinguished the award of backpay to illegal aliens, which was impermissible, from the award of backpay to employees who testified falsely under oath, which was permissible.  Hoffman, 535 U.S. at 145 (*citing* ABF Freight Sys., Inc. v. NLRB, 510 U.S. 317 (1994)).  Like here, and unlike Hoffman, the award of backpay to an employee who lied under oath in ABF "did not implicate federal statutes or policies administered by other federal agencies" and "was not at all analogous to misconduct that renders an underlying employment relationship illegal under explicit provisions of federal law."  Hoffman, 535 U.S. at 146.

While the Commission made no finding that Risk intentionally misrepresented anything, but rather his certification was issued "in error," Risk's decertification is clearly more analogous to the employee who lied under oath in ABF than the employees who were working illegally in Hoffman and Sure-Tan.  Therefore, the NLRB illegal immigrant cases do not preclude an award of backpay under Title VII.[26]

### G.     Defendant Waived Several Issues by Not Briefing Them.

Finally, Defendant raised the following issues in its motion, but failed to brief them:

---

[25](...continued)
blameworthy conduct")(emphasis in original).

[26]Despite being decided 7 years after McKennon, Hoffman did not even attempt to distinguish McKennon.
*See generally* Hoffman, 535 U.S. 137.  Presumably, the issues were so different in the two cases that the distinction did not even need to be explained.

1.      The excessiveness of the jury's verdict. (Motion for a New Trial, 2(o)).

2.      Dismissal of the case under the <u>Younger,</u> <u>Burford,</u> and <u>Pullman</u> doctrines. (Motion for Judgment as a Matter of Law, 3(c); Motion for a New Trial, 2(c)).

3.      Failure to prove others were retained who were perceived as not needing religious accommodation. (Motion for Judgment as a Matter of Law, 3(e); Motion for a New Trial, 2(g)).

4.      The availability of Dan Johnson to testify in person. (Motion for a New Trial, 2(n)).

Therefore, the above issues are waived.  <u>Voci v. Gonzales</u>, 409 F.3d 607, 610 n.1 (3d Cir. 2005); <u>Laborers Int'l Union of North Am. v. Foster Wheeler Energy Corp.</u>, 26 F.3d 375, 398 (3d Cir.1994)(failure to brief constitutes waiver, and a passing reference will not suffice to preserve issue); <u>Wilson v. Equifax, Inc.</u>, 1998 WL 122098 at *2 (W.D. Pa. 1998)(Ambrose, J.)(failure to brief is waiver even when issue raised in motion).

## IV. Conclusion

For the foregoing reasons, this Court should deny Defendant's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial. This Court should also not disturb its backpay award.

Respectfully submitted,

**Ogg, Cordes, Murphy & Ignelzi, L.L.P.**

<u>/S/ Samuel J. Cordes</u>
Samuel J. Cordes
Pa. I.D. #54874

245 Fort Pitt Boulevard
Pittsburgh, PA 15222
(412) 471-8500

Attorney for Plaintiff

40

## CERTIFICATE OF SERVICE

I hereby certify on this 28th day of August, 2008 I served a copy of ***Plaintiff's Brief in Opposition to Defendant's Motion for Judgment as a Matter of Law or for a New Trial*** via electronic mail upon the following:

Patricia Monahan
Paul D. Krepps
Marshall, Dennehey, Warner, Coleman & Goggin
600 Grant Street, USX Tower
Suite 2900
Pittsburgh, PA 15219

/S/ Samuel J. Cordes
Samuel J. Cordes